# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 01-4080, 01-4081 & 02-1346

NORMAN C. GREEN, JR., DONALD LEE,
GLENN TURNER, and DENNIS E. JONES-EL,

*Plaintiffs-Appellants*,

v.

GERALD A. BERGE and JAMES E. DOYLE,
ATTORNEY GENERAL,

*Defendants-Appellees.*

———————

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 01-C-314—**Barbara B. Crabb**, *Chief Judge.*

———————

ARGUED NOVEMBER 4, 2003—DECIDED JANUARY 9, 2004

———————

Before EASTERBROOK, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* The four plaintiffs—all felons serving prison terms at Wisconsin's Supermax penitentiary—filed this suit challenging a Wisconsin law which compels them to submit a deoxyribonucleic acid (DNA) sample for analysis and storage in a data bank. The plaintiffs contend that taking samples of their DNA pursuant to the law is an unconstitutional search and seizure in violation of the Fourth Amendment of the United States

Constitution. The district court dismissed the complaint under 28 U.S.C. § 1915A, and today we resolve the plaintiffs' appeal.

Except for identical twins, no two people have the same DNA. *See* Thomas M. Fleming, Annotation, "Admissibility of DNA Identification Evidence," 84 A.L.R.4th 313 at § 2(b) (1991). In addition, an individual's DNA is the same in every nucleated cell in his body. Thus, a DNA analysis makes the identification of a specific person "to the practical exclusion of all others." *Id.*

The Wisconsin law, § 165.76 *et seq.*, was passed in 1993. In its original form, only prisoners convicted of certain offenses were required to give DNA samples for analysis. In 1999, the law was amended to require that all persons convicted of felonies in Wisconsin (and those who were in prison at the time) provide DNA samples for analysis and storage in the state's data bank.

The statutory scheme provides standards for laboratory testing of the DNA samples. It contains a confidentiality provision, and it provides penalties for the unlawful dissemination of information obtained under the statute. The law also provides that if an individual's conviction or adjudication has been reversed, set aside, or vacated, the State's Crime Laboratory (where the data is held) must "purge all records and identifiable information in the data bank pertaining to the person and destroy all samples from the person."

All 50 states and the federal government have adopted DNA collection and data bank storage statutes that, although not identical, are similar to the one in Wisconsin. *See* Robin Cheryl Miller, Annotation, "Validity, Construction, and Operation of State DNA Database Statutes," 76 A.L.R.5th 239 (2000). Challenges to these statutes as a whole and to their subparts have almost uniformly been unsuccessful. Thus, the plaintiffs in this

suit face a decidedly uphill struggle on their one claim that their constitutional rights were violated when DNA was extracted from them in the absence of a warrant, probable cause, or an individualized and reasonable suspicion to believe they committed a crime.

Although the taking of a DNA sample is clearly a search, the Fourth Amendment does not proscribe all searches, only those that are unreasonable. In some instances where a search is not made pursuant to a warrant supported by probable cause, it may nonetheless be reasonable if it falls within an exception to the warrant requirement and is supported by "some quantum of individualized suspicion." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976). But even individualized suspicion is not always necessary to support a finding that a search is reasonable. *See id.* at 560-61; *see also Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 624 (1989) ("individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable"); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989) ("neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance").

Although the United States Supreme Court has yet to address the validity of DNA collection statutes under the Fourth Amendment, as we just noted, state and federal courts that have are almost unanimous in holding that these statutes do not violate the Fourth Amendment. See cases cited in the persuasive opinion of Magistrate Judge Gorenstein in *Nicholas v. Goord*, 2003 WL 256774 (S.D.N.Y. 2003). *But see United States v. Kincade*, 345 F.3d 1095 (9th Cir. 2003) (holding that forced blood extractions from federal parolees pursuant to the federal DNA Analysis Backlog Elimination Act violates the Fourth Amendment in the absence of individualized suspicion).

Courts uphold these DNA collection statutes because the government interest in obtaining reliable DNA identification evidence for storage in a database and possible use in solving past and future crimes outweighs the limited privacy interests that prisoners retain. Also, courts generally conclude that the collection of biological samples is only a minimal intrusion on one's personal physical integrity. These courts find that the government has a special need in obtaining identity DNA samples. The Tenth Circuit Court of Appeals recently summarized the "special need" met by the federal DNA Act:

> The DNA Act, while implicating the Fourth Amendment, is a reasonable search and seizure under the special needs exception to the Fourth Amendment's warrant requirement because the desire to build a DNA database goes beyond the ordinary law enforcement need.

*United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir. 2003).

In *Shelton v. Gudmanson*, 934 F. Supp. 1048 (W.D. Wis. 1996), Judge (now Chief Judge) Crabb succinctly summarized the "special needs" line of cases that permit warrantless searches without individualized suspicion in a DNA collection case:

> Like administrative searches, in which the warrant and probable cause showing are replaced by the requirement of showing a neutral plan for execution, a compelling governmental need, the absence of less restrictive alternatives and reduced privacy rights, *see Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), special needs searches adopt a balancing of interests approach. Special needs searches have been held to include drug testing of railway executives, *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989),

customs officers, *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), probationers' homes, *Griffin*, 483 U.S. at 868, 107 S.Ct. at 3165-66, and high school students participating in athletics, *Vernonia School District 47 v. Acton*, ___ U.S. ___, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). In determining the reasonableness of these searches, the Supreme Court has considered the governmental interest involved, the nature of the intrusion, the privacy expectations of the object of the search and, to some extent, the manner in which the search is carried out. In *Griffin*, 483 U.S. at 868, 107 S.Ct. At 3165-66, for example, the Court noted that the warrantless search of the probationer's home had been carried out pursuant to valid regulations promulgated by the state. Although the state's DNA testing of inmates is ultimately for a law enforcement goal, it seems to fit within the special needs analysis the Court has developed for drug testing and searches of probationers' homes, since it is not undertaken for the investigation of a specific crime.

934 F. Supp. at 1050-51. We agree with and adopt the views expressed by Chief Judge Crabb.

In arguing against the constitutionality of the Wisconsin law, the plaintiffs rely heavily on *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), and *Ferguson v. City of Charleston*, 532 U.S. 67 (2001). They insist that the combined impact of these cases undermines all of the decisions upholding various DNA statutes because they can no longer be viewed as reasonable under the Fourth Amendment if their primary purpose is to assist law enforcement. We disagree.

In *City of Indianapolis v. Edmond*, the city instituted a motor vehicle checkpoint program whose primary purpose was interdicting illegal narcotics trafficking. The program allowed police to randomly stop motorists on public high-

ways without a warrant and without probable cause. While checking the motorists for compliance with license and registration requirements (as well as intoxication), police used a drug-sniffing dog in hopes of finding evidence of narcotics possession on the driver or in the car.

An important distinction between our case and *Edmond* is that the primary purpose of the Indianapolis checkpoint program was to see if a driver was then and there engaged in illegal drug activity. The primary purpose of the Wisconsin DNA law, on the other hand, is not to search for "evidence" of criminal wrongdoing. Its purpose is to obtain reliable proof of a felon's identity. *Edmond* says much about indiscriminate motor vehicle roadblocks and checkpoints but nothing about safe, nondiscriminatory collection of DNA samples from lawfully incarcerated felons.

*Ferguson* also provides no help for our plaintiffs. The issue there was whether the state's "interest in using the threat of criminal sanctions to deter pregnant women from using cocaine can justify a departure from the general rule that an official nonconsensual search is unconstitutional if not authorized by a valid warrant." 532 U.S. at 70. The case involved a state hospital program whereby staff, without the consent of its patients, performed drug scans of the urine of pregnant women for the purpose of detecting the presence of cocaine for possible criminal prosecution. Positive test results were reported to police.

*Ferguson* drew a distinction from other cases upholding warrantless and suspicionless drug tests of employees and students under the "special needs" doctrine.

> In the previous four cases, there was no misunderstanding about the purpose of the test or the potential use of the test results, and there were protections against the dissemination of the results to third parties. The use of an adverse test result to disqualify one from eligibility

> for a particular benefit, such as a promotion or an opportunity to participate in an extracurricular activity, involves a less serious intrusion on privacy than the unauthorized dissemination of such results to third parties. The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent.

532 U.S. at 78.

In contrast, the plaintiffs here had no misunderstanding about the purpose of the DNA test or the potential use of the test results. There are built-in statutory proscriptions against the unauthorized dissemination of test results to third parties. The intrusion on the plaintiffs' limited privacy interest is far less than that on unsuspecting pregnant women in a hospital but otherwise free of state custody.

Wisconsin's DNA collection statute is, we think, narrowly drawn, and it serves an important state interest. Those inmates subject to testing because they are in custody, are already "seized," and given that DNA is the most reliable evidence of identification—stronger even than fingerprints or photographs—we see no Fourth Amendment impediments to collecting DNA samples from them pursuant to the Wisconsin law. The Wisconsin law withstands constitutional attack under the firmly entrenched "special needs" doctrine.

Because we have never addressed this issue, and the plaintiffs' appeal for that reason is not frivolous, we decline to add an additional strike to their record pursuant to the Prison Litigation Reform Act. A strike, however, was appropriately recorded by the district court as the plaintiffs' complaint did not state a claim for which relief could be granted.

The judgment of the district court is AFFIRMED.

EASTERBROOK, *Circuit Judge*, concurring. While joining the court's opinion without reservation, I offer some additional observations.

Courts that have dealt with constitutional challenges to DNA-collection statutes frequently have lumped together all persons subject to these laws. Yet there are at least four major categories, potentially subject to differing legal analysis.

Prisoners make up the first category. Their privacy interests are extinguished by the judgments placing them in custody. As a result, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). See also, e.g., *Johnson v. Phelan*, 69 F.3d 144 (7th Cir. 1995). Testing prisoners' blood, urine, saliva, or hair for drugs is routine and does not require individual suspicion. DNA is present in all living cells, so it may be obtained from any of the blood or other samples regularly collected from prisoners. Indeed, prisons may conduct body-cavity searches without suspicion, see *Bell v. Wolfish*, 441 U.S. 520 (1979), though nothing of the kind would be allowed for free persons. Collecting DNA is much less intrusive. Prisons, moreover, have a constitutional duty to attend to inmates' medical needs, and the discharge of this duty requires them to learn details about the inmates' medical conditions. That will entail the drawing of blood (how else could the prison learn whether an inmate is diabetic?), and like other specimens the inmates' blood may be put to multiple uses, including preservation of DNA, for the fourth amendment does not control how properly collected information is deployed. Use of DNA is in this respect no different from use of a fingerprint; only the method of obtaining the information differs, and for prisoners that is a distinction without importance.

Persons on conditional release—parole, probation, supervised release, and the like—are the second category. They

have acquired additional liberty but remain subject to substantial controls. People who object to the conditions of release before the end of their sentences may say no and remain in prison; if they say yes, they have consented to the conditions. See *United States v. Cranley*, No. 03-1908 (7th Cir. Nov. 19, 2003). (Society may restore a felon's freedom in increments; it does not face an all-or-none choice.) One common condition of release is submission to tests for drugs, without the need for person-specific suspicion. DNA may be extracted from samples obtained through these tests without any incremental invasion of privacy. And if such an incremental invasion is required: well, it is beyond dispute that conditions of release related to enforcing the criminal laws are valid, because refraining from new crime is one vital condition of parole and like states. Thus parolees may be required to submit to searches of their homes without probable cause, see *Griffin v. Wisconsin*, 483 U.S. 868 (1987); *United States v. Knights*, 534 U.S. 112 (2001), to report regularly to government offices to give accounts of their activities, to get approval for new employment or living arrangements, and so on. DNA collection is less invasive than a search of one's home, and as information from DNA may be very helpful in solving crimes (and thus enforcing a condition of release), there is no problem under the fourth amendment.

Felons whose terms have expired are the third category. Established criminality may be the basis of legal obligations that differ from those of the general population. "A broad range of choices that might infringe constitutional rights in free society fall within the expected conditions . . . of those who have suffered a lawful conviction*." McKune v. Lile*, 536 U.S. 24, 36 (2002). One need only think of Megan's Law and its variations across the nation. See *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003). Felons likewise are subject to limits on ownership of weapons and participation in certain occupations (including law). Greater

post-release restrictions on those with a known criminal propensity make it possible to curtail the time felons must linger in prison. Collecting felons' DNA, like collecting their fingerprints, handwriting exemplars, and other information that may help solve future crimes (and thus improve the deterrent force of the criminal sanction) is rationally related to the criminal conviction. (That collection of Felon A's DNA may help Accused B show his innocence of a charge is a benefit into the bargain.)

Those who have never been convicted of a felony are the last distinct category. What is "reasonable" under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population. Just as parolees' homes may be searched without a warrant or probable cause, while both are required to search a free person's home, so it may be that collection of DNA samples from the general population would require person-specific cause—or at least a "special need," whatever the meaning of that phrase in recent decisions turns out to be. See *Indianapolis v. Edmond*, 531 U.S. 32 (2000); *Ferguson v. City of Charleston*, 532 U.S. 67 (2001). The majority in *United States v. Kincade*, 345 F.3d 1095 (9th Cir. 2003), which held that the DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C. §14135a, violates the fourth amendment, made a fundamental error when it applied the "special need" approach of *Edmond* and *Ferguson* to persons on supervised release from criminal sentences that have yet to expire. That confuses the fourth category with the second. *Knights*, which held that conditions of supervised release may be enforced without regard to whether they would be "reasonable" as applied to the general population, was issued after *Edmond* and *Ferguson*; the Justices evidently perceive that these decisions cover different domains.

This appeal does not present the question whether DNA could be collected forcibly from the general population, and

I understand the court's reference to *Edmond* and *Ferguson* to mean no more than that these decisions are compatible with collecting and preserving DNA from persons in the first two categories, and likely from those in the third. There will be time enough to address the fourth if and when a more general statute about the collection and use of medical information should be enacted.

A true Copy:

     Teste:

               _____
               *Clerk of the United States Court of Appeals for the Seventh Circuit*