[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 4, 2005
THOMAS K. KAHN
CLERK**

No. 03-16527

_____

D. C. Docket No. 01-01936 CV-TWT-1

ROY PADGETT, et al.,

Plaintiff,

PAUL N. BOULINEAU,
JOHN BURNEY,

Plaintiffs-Appellants,

versus

JAMES E. DONALD, Commissioner of
Georgia Department of Corrections,
GEORGIA BUREAU OF INVESTIGATION, and
GEORGIA DEPARTMENT OF CORRECTIONS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 4, 2005)**

Before ANDERSON and BIRCH, Circuit Judges, and ROYAL[*], District Judge.

BIRCH, Circuit Judge:

In a case of first impression for our circuit, we decide whether the United States and Georgia Constitutions permit the Georgia Department of Corrections to compel incarcerated felons to submit saliva samples for DNA profiling, pursuant to O.C.G.A. § 24-4-60. The district court granted summary judgment in favor of the Commissioner of the Georgia Department of Corrections. Because we conclude that the statute does not violate the Fourth Amendment, the search and seizure provisions of the Georgia Constitution, or the felons' rights to privacy under the United States or Georgia Constitutions, we AFFIRM.

## I. BACKGROUND

The material facts in this case are not in dispute. In 2000, the Georgia General Assembly amended O.C.G.A. § 24-4-60 ("the statute") to require convicted, incarcerated felons to provide a sample of their DNA to the Georgia Department of Corrections ("GDOC") for analysis and storage in a data bank maintained by the Georgia Bureau of Investigation ("GBI"). See O.C.G.A. § 24-4-60.[1] The DNA profiles can be released from the data bank "to federal, state, and

_____

[*]Honorable C. Ashley Royal, United States District Judge for the Middle District of Georgia, sitting by designation.

[1] The relevant portion of the statute provides:
    In addition, on and after July 1, 2000, any person convicted of a

2

local law enforcement officers upon a request made in furtherance of an official investigation of any criminal offense." O.C.G.A. § 24-4-63(a). The statute applies to all persons convicted of a felony and incarcerated on or after 1 July 2000 and all felons incarcerated as of that date. O.C.G.A. § 24-4-60.

The statute allows the GDOC to obtain an incarcerated felon's DNA sample

---

felony and incarcerated in a state correctional facility shall at the time of entering the prison system have a sample of his or her blood, an oral swab, or a sample obtained from a noninvasive procedure taken for DNA (deoxyribonucleic acid) analysis to determine identification characteristics specific to the person. The provisions and requirements of this Code section shall also apply to any person who has been convicted of a felony prior to July 1, 2000, and who currently is incarcerated in a state correctional facility in this state for such offense. The provisions and requirements of this Code section shall also apply to any person who has been convicted of a felony in this state on or after July 1, 2000, and who is incarcerated in a private correctional facility in this state for such offense pursuant to a contract with the Department of Corrections upon entering the facility, and for any person convicted of a felony prior to July 1, 2000, and who is incarcerated in a private correctional facility in this state pursuant to contract with the Department of Corrections. The analysis shall be performed by the Division of Forensic Sciences of the Georgia Bureau of Investigation. The division shall be authorized to contract with individuals or organizations for services to perform such analysis. The identification characteristics of the profile resulting from the DNA analysis shall be stored and maintained by the bureau in a DNA data bank and shall be made available only as provided in Code Section 24-4-63. For the purposes of this Code section, the term "state correctional facility" means a penal institution under the jurisdiction of the Department of Corrections, including inmate work camps and inmate boot camps; provided, however, that such term shall not include a probation detention center, probation diversion center, or probation boot camp under the jurisdiction of the Department of Corrections.

O.C.G.A. § 24-4-60.

by taking blood, swabbing the inside of his mouth for saliva, or using any other noninvasive procedure. Id. In implementing the statute, the GDOC formulated policy dictating that members of the prison staff obtain the samples by swabbing the inside of felons' mouths for saliva. The GDOC then sends the swabs to the GBI for typing and placement in the DNA database. Inmates that refuse to submit to the procedure are subjected to disciplinary reports followed by hearings and possible disciplinary action. If any inmate still refuses to cooperate, the prison staff takes the sample by force.

Roy Padgett, a Georgia prison inmate, filed a pro se civil rights action challenging the constitutionality of the statute. Paul Boulineau and John Burney, prison inmates convicted of felonies prior to 1 July 2000, intervened,[2] and counsel was appointed. Padgett was later dismissed from the action and is not a party to this appeal.

In their Amended Complaint, Boulineau and Burney sought a declaratory judgment that the statute violated their constitutional rights and an injunction preventing the GDOC from taking their DNA without their consent. They claimed the statute (1) violated the search and seizure provisions of the United States and Georgia Constitutions; (2) violated the Fifth and Fourteenth Amendment because

---

[2] Frederick Pettigrew also intervened. He was later dismissed from the action and is not a party to this appeal.

4

it is unreasonably vague; (3) deprived them of due process of law; (4) violated their rights to privacy under the United States and Georgia Constitutions; and (5) constituted an ex post facto law in violation of the United States and Georgia Constitutions. They named the GBI, the GDOC, and the Commissioner of the GDOC ("the Commissioner") as defendants.

On cross-motions for Summary Judgment, the district court granted the GBI, the GDOC, and the Commissioner's motion for Summary Judgment and denied Boulineau and Burney's motion. The district court held that Boulineau and Burney had abandoned their claims against the GBI and the GDOC. As for their search and seizure and right to privacy claims against the Commissioner, the claims they appeal here, the district court concluded that the statute did not authorize an unreasonable search or infringe their rights to privacy in violation of the United States or Georgia Constitutions. In evaluating Boulineau and Burney's search and seizure claims, the court applied a balancing test and held that Georgia's legitimate interest in creating a DNA data bank outweighs their diminished privacy interests. It rejected Boulineau and Burney's argument that Georgia could not take their DNA sample without a suspicion of individual wrongdoing absent a "special need" other than general law enforcement. As for their right to privacy claims, the district court held that the bodily intrusion caused by the statute is minimal in light

of the other invasions prisoners endure by virtue of their incarceration. It further concluded that the state's interest in creating a DNA data bank outweighs any privacy rights that Boulineau and Burney have in their identities. On appeal, Boulineau and Burney argue that the district court erred in concluding that the warrantless extraction and analysis of their DNA under the statute (1) is a constitutional search under the United States and Georgia Constitutions; and (2) does not violate their rights to privacy.[3]

Prior to his scheduled release date, Burney moved for an injunction to prevent the collection, analysis, and storage of his DNA sample. The district court ordered Burney to provide a DNA sample but enjoined the Commissioner, the GDOC, and the GBI from analyzing the sample or including it in the data bank until further order of the court. By consent order entered on 13 January 2004, Boulineau also provided a DNA sample to the GDOC. Neither Burney nor Boulineau's DNA sample will be analyzed or stored in the data bank until the outcome of this litigation.

## II. DISCUSSION

---

[3]Boulineau and Burney do not address the district court's conclusion that they abandoned their claims against the GBI and the GDOC. Thus, they waive any arguments against these defendants, and we only address their arguments against the Commissioner. See United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (appellant abandons any issue not raised on appeal).

We review de novo a district court's legal conclusions as to the constitutionality of a statute. Doe v. Kearney, 329 F.3d 1286, 1293 (11th Cir. 2003), cert. denied __ U.S. __, 124 S. Ct. 389.

A. Search and Seizure

Under the Fourth Amendment,

> "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

U.S. CONST. amend. IV. The Commissioner does not dispute that the statutorily required extraction of saliva for DNA profiling constitutes a "search" within the meaning of the Amendment. See Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616-17, 109 S. Ct. 1402, 1412-13 (1989) (blood tests, breathalyser tests, and the taking of urine constitute searches); Cupp v. Murphy, 412 U.S. 291, 295, 93 S. Ct. 2000, 2003 (1973) (inquiry that goes "beyond mere physical characteristics . . . constantly exposed to the public" constitutes a search). As such, we need address only the search's reasonableness, an inquiry which takes into account "all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." See Skinner, 489 U.S. at 619, 109 S. Ct. at 1414 (citations omitted).

7

Although reasonableness in most criminal cases depends on the government's obtaining a warrant supported by probable cause, the Supreme Court has emphasized "the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 109 S. Ct. 1384, 1390 (1989); accord Skinner, 489 U.S. at 624, 109 S. Ct. at 1417 ("[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable."). Suspicionless searches have been upheld, for example, to protect the country's borders, United States v. Ramsey, 431 U.S. 606, 619, 97 S. Ct. 1972, 1980 (1977), to maintain order within prisons, Hudson v. Palmer, 468 U.S. 517, 527, 104 S. Ct. 3194, 3201 (1984), and to achieve certain administrative purposes, New York v. Burger, 482 U.S. 691, 702-04, 107 S. Ct. 2636, 2643-44 (1987). In these "special needs" cases, the Court has performed the traditional Fourth Amendment analysis–balancing the interests of the state against the privacy interests of the individual–only after finding that the search vindicated a "special need" of government that goes beyond general law enforcement. See, e.g., Skinner, 489 U.S. at 619-20, 109 S. Ct. at 1414-15 (upholding nonconsensual blood and urine tests of certain railroad employees).

Each circuit to address the question has upheld the constitutionality of DNA profiling statutes, but the circuits have disagreed on whether to do so through the special needs analysis or through the traditional balancing test. The Second, Seventh, and Tenth Circuits have engaged in balancing only after finding that the statute served a special need beyond general law enforcement. See Roe v. Marcotte, 193 F.3d 72, 79 (2d Cir. 1999); Green v. Berge, 354 F.3d 675, 679 (7th Cir. 2004); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1997). The Fourth, Fifth, and Ninth Circuits have applied the traditional balancing test without finding a special need. See Jones v. Murray, 962 F.2d 302, 306-07 (4th Cir. 1992); Groceman v. United States Dep't of Justice, 354 F.3d 411, 413 (5th Cir. 2004) (per curiam); United States v. Kincade, 379 F.3d 813, 832 (9th Cir. 2004) (reaffirming balancing approach of Rise v. Oregon, 59 F.3d 1556, 1559 (9th Cir. 1995)).

Boulineau and Burney argue that the Supreme Court's decisions in City of Indianapolis v. Edmond, 531 U.S. 32 (2000), and Ferguson v. City of Charleston, 532 U.S. 67 (2001), require us to join the Second, Seventh and Tenth Circuits in applying the special needs analysis. In contrast, the Commissioner argues that we should follow the Fourth, Fifth, and Ninth Circuits and engage in traditional balancing. This question of which analysis to apply is more than academic: in Edmond and Ferguson, the Supreme Court limited the scope of the special needs

9

exception by rejecting states' arguments that suspicionless searches with stated goals of drug rehabilitation and interdiction served special needs beyond general law enforcement. See Edmond, 531 U.S. at 41-42, 121 S. Ct. at 454 ("Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment."); Ferguson, 532 U.S. at 83-84, 121 S. Ct. at 1291-92 (deeming unconstitutional searches with the broader goal of drug rehabilitation for women because their immediate objective was general law enforcement). If we apply the "special needs" analysis, Boulineau and Burney argue, we cannot uphold the statute under these cases. Because we conclude that Knights, 534 U.S. 112, 122 S. Ct. 587 (2001), not Ferguson and Edmond, is the applicable Supreme Court precedent, we agree with the Commissioner.[4]

Prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison," Bell v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877 (1979), but they do not enjoy the same Fourth Amendment rights as free persons. See Harris v. Thigpen, 941 F.2d 1495, 1513 (11th Cir. 1991) (noting that a prisoner retains only those rights consistent "with his status as a prisoner or with the legitimate penological objectives of the corrective system" (citations

---

[4] Because we uphold the statute under a totality of the circumstances analysis, we do not address whether it could satisfy a "special needs" analysis.

10

omitted)).  Prisoners have no Fourth Amendment rights against searches of their prison cells, for example.  Hudson v. Palmer, 468 U.S. 517, 526 (1984).  They must submit to visual body-cavity searches executed without individualized suspicion.  Bell, 441 U.S. at 558, 99 S. Ct. at 1884.  They must undergo routine tests of their blood, hair, urine, or saliva for drugs.  Green v. Berge, 354 F.3d 675, 679 (7th Cir. 2004) (Easterbrook J., concurring).  Because of these and other limitations on prisoners' Fourth Amendment rights, courts have recognized that prisoners comprise a separate category of persons for purposes of the Amendment.  See, e.g., Jones, 962 F.2d at 307 n.2; see also, e.g., Green, 354 F.3d at 679 (Easterbrook, J., concurring).

Ferguson and Edmond struck down suspicionless searches because they vindicated no special need distinguishable from general law enforcement.  However, the searches they discussed were performed on free persons, not incarcerated felons.  Edmond, 531 U.S. at 40-41, 121 S. Ct. at 453-54 (police searched motorists' cars at roadside checkpoints in order to uncover "evidence of ordinary criminal wrongdoing"); Ferguson, 532 U.S. at 82, 121 S. Ct. at 1290-91 (hospital personnel administered drug tests to certain pregnant woman and turned over any positive results to the police).  Neither case condemned suspicionless searches of prisoners executed without a special need nor required us to apply the

11

special needs analysis in every situation.

After Ferguson and Edmond, the Supreme Court used the traditional balancing test to evaluate warrantless searches performed on probationers, who, like prisoners, have limited Fourth Amendment rights because of their relationship with the state. In United States v. Knights, the Court applied the balancing test to uphold a warrantless search of a probationer's home. The search was conducted for general law enforcement purposes only and was not based on a "special need."[5] 534 U.S. at 118-21, 122 S. Ct. at 591-92. Key to the Court's ruling was Knights' status as a probationer. Id. at 119, 122 S. Ct. at 591 ("Knights' status as a probationer informs both sides of the balance.") Likening probation to incarceration, the Court noted that probationers do not "enjoy the absolute liberty to which every citizen is entitled." Id. (citations omitted). Probationers are more likely to violate the law than ordinary citizens, the Court concluded, and the state's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." Id. at 120-21, 122 S. Ct. at 592. The Court explicitly rejected the argument that only searches of probationers serving a

_____

[5]Although Knights involved a search based on reasonable suspicion, the Court left open the question of whether suspicionless searches of probationers are constitutional. Knights, 534 U.S. at 120 n.6.

12

"special need" are constitutionally permissible.  Id. at 117-18, 122 S. Ct. at 590-91.

If the Supreme Court approves dispensing with the special needs analysis for probationers, we are persuaded that we may take a similar approach in cases involving prisoners, who enjoy less Fourth Amendment rights.[6]  See Green, 354 F.3d at 679-80 (Easterbrook, J., concurring) (arguing that the rights of prisoners, probationers, convicted but released felons, and free persons represent a continuum of Fourth Amendment liberties and may be subjected to different Fourth Amendment analyses).  As such, Ferguson and Edmond, while consistent with our ruling, do not apply here.  Instead, we follow Knights and apply a traditional balancing test.

Utilizing the Knights approach, we next address whether the statute is reasonable under a totality of the circumstances analysis.  We employ a balancing test, weighing the degree to which the search intrudes on an individual's privacy against the degree to which it promotes a legitimate governmental interest.  See

_____

[6]Boulineau and Burney suggest that our decision in Fortner v. Thomas, 983 F.2d 1024, 1030 (11th Cir.), requires us to conclude that prisoners enjoy the same rights to bodily privacy as free persons unless the statutorily mandated intrusion furthers a legitimate penological interest, such as institutional security.  Although we concluded in Fortner that prisoners retain a right to bodily privacy that may be violated if female prison guards can view male prisoners in states of nudity, we held that this right was limited and noted that prisoners' rights to privacy are evaluated on a case-by-case basis.  983 F.2d at 1030.  We continue to hold that prisoners, unlike free persons, retain only those rights that are consistent with their incarceration.  See Harris, 941 F.2d at 1513.  Because we rely on Knights to apply the balancing test to searches of prisoners, we do not need to address whether the DNA profiling statute requires a search that is justified by penal concerns.

Knights, 534 U.S. at 118-19, 122 S. Ct. 591. The Fourth Circuit applied the totality of the circumstances analysis and found a similar statute to be a reasonable intrusion into convicted felons' privacy. See Jones, 962 F.2d at 306-08. Because we believe that Georgia's legitimate interest in creating a permanent identification record of convicted felons for law enforcement purposes outweighs the minor intrusion involved in taking prisoners' saliva samples and storing their DNA profiles, given prisoners' reduced expectation of privacy in their identities, we adopt the reasoning in Jones and hold that the statute does not violate the Fourth Amendment. See 962 F.2d at 306-08.

We also apply the balancing test to evaluate the reasonableness of the statutorily required search under the search and seizure provision of the Georgia Constitution. See GA. CONST. art. I, § 1, ¶ 13; City of East Point v. Smith, 258 Ga. 111, 112 (1988) (evaluating reasonableness of a search under the Georgia Constitution by looking to the Fourth Amendment cases as persuasive authority and applying the balancing test); Wells v. State, 348 S.E.2d 681, 683 (Ga. App. 1986) (noting that Georgia adopted the "totality of the circumstances" test in evaluating reasonableness of searches under its Constitution and that the standard under the federal and state Constitutions are the same). For the same reasons we adopt in our Fourth Amendment analysis, we hold that the statute does not violate

14

Boulineau and Burney's rights to be free from unreasonable search and seizures under the Georgia Constitution.

B.     <u>Right to Privacy</u>

Boulineau and Burney contend that the district court erred in concluding that the forcible extraction of their DNA does not violate their rights to bodily privacy as guaranteed by the United States and Georgia Constitutions. Because they explicitly waive the argument that they have an independent right to privacy in their identities, we address only the bodily intrusion caused by the statute.

1.     The United States Constitution

The United States Constitution does not expressly guarantee a right to privacy, but the Supreme Court has held that a right to privacy does exist within the liberty component of the Fourteenth Amendment. <u>See</u> <u>Roe v. Wade</u>, 410 U.S. 113, 152-53, 93 S. Ct. 705, 726-27 (1973). To date, the Supreme Court has recognized two types of interests protected by the right to privacy. First, the right to privacy guards an individual's interest in avoiding disclosure of certain personal matters. Second, it protects an individual's personal autonomy in making certain important decisions, such as those involving marriage, contraception, and procreation. <u>Whalen v. Roe</u>, 429 U.S. 589, 598-99, 97 S. Ct. 869, 876-77 (1977); <u>Carey v. Population Servs. Int'l</u>, 431 U.S. 678, 684, 97 S. Ct. 2010, 2016 (1977);

15

Harris v. Thigpen, 941 F.2d 1495, 1513 n.26 (11th Cir. 1991).

Boulineau and Burney argue that our decision in Fortner v. Thomas, 983 F.2d 1024 (11th Cir. 1993), establishes that prisoners enjoy a right to bodily privacy that is infringed by the compelled extraction of their saliva. In Fortner, we held that male prisoners' rights to bodily privacy may be violated by allowing female correctional officers to view them in states of nudity. Id. at 1029-30. We explained, "[M]ost people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." Id. at 1030 (citations omitted). We thus based our holding on the Supreme Court's recognition that people have a protected privacy interest in avoiding disclosure of certain personal matters–there, the exposure of their naked bodies. See id. at 1030. We did not consider prisoners' right to privacy against other types of governmental intrusions, and Fortner cannot be read to expand the right to privacy to interests other those involving certain compelled nudity.

The statute no doubt requires the disclosure of prisoners' personal DNA information, albeit to a limited audience for limited, law enforcement purposes. However, Boulineau and Burney explicitly limit their privacy challenge to the bodily intrusion caused by the statute:

> Boulineau and Burney are not trying to hide who they are, or to prevent the state from keeping a record of lawfully obtained DNA samples. Instead, they seek to prevent illegal searches of their persons and to prevent the state from using the fruits of these illegal searches in hypothetical future criminal investigations.

Br. of Appellants Paul Boulineau and John Burney at 34. The extraction of saliva itself does not implicate their interests in avoiding disclosure of information, but rather "the right of the individual to be free in his private affairs from governmental . . . intrusion." Whalen v. Roe, 429 U.S. at 599 n.24, 97 S. Ct. at 876 (1977) (citations omitted). Fortner does not address prisoners' bodily privacy in this context.

Prisoners do "retain certain certain fundamental rights to privacy," and Fortner did not foreclose the possibility that prisoners enjoy other rights to bodily privacy in our circuit. 983 F.2d at 1029-30 (citations omitted). Nonetheless, we conclude that the right Boulineau and Burney claim here is neither "fundamental" nor "implicit in the concept of ordered liberty." See Roe, 410 U.S. at 152, 93 S. Ct. at 726. As we discussed supra section II.A, prisoners routinely undergo drug testing, which requires a bodily intrusion similar to the intrusion here. This and the other restrictions on their freedom which are inherent to their status as prisoners indicate that the right Boulineau and Burney claim here is not protected by the

right to privacy.[7]

   2.  The Georgia Constitution

The Georgia Constitution gives its citizens a right to privacy that is broader than that recognized by the United States Constitution.  Georgia considers privacy a fundamental right, and it requires that courts carefully scrutinize cases in which an individual's privacy may have been infringed.  King v. Georgia, 272 Ga. 788, 789 (2000).  The right to privacy protects matters that a reasonable person would consider private.  Id. at 790.

A person's privacy interest is not inviolable, however.  The state may constitutionally intrude upon a protected privacy interest "pursuant to a statute which effectuates a compelling state interest and which is narrowly tailored to promote only that interest."  Law enforcement constitutes a compelling state interest.  Id. at 791.

In spite of their incarceration, Boulineau and Burney retain a right to bodily

_____

[7]Citing Turney v. Safley, 482 U.S. 78, 97 (1987), Fortner v. Thomas, 983 F.2d 1024, 1030 (11th Cir. 1993), and several other cases from other circuits, Boulineau and Burney argue that the district court erred in failing to find a legitimate penological purpose behind the statute before authorizing the required intrusion into their privacy.  They contend that absent individualized suspicion, "the only applicable rationale [for invading any retained privacy rights of prisoners] is . . . for legitimate penological purposes."  The cases do not stand for this proposition.  Turner addresses prison regulations, not statutes, 482 U.S. at 89, and it leaves intact the long standing rule that prisoners do not enjoy constitutional rights "inconsistent with [their] status as . . . prisoner[s]."  Id. at 94; see Hudson, 468 U.S. at 523.  Fortner, as discussed previously, is inapposite.  The other cases cited by Bouliney and Bourney are Fourth Amendment cases involving free persons.

18

privacy under the Georgia Constitution. <u>Zant v. Prevatte</u>, 248 Ga. 832, 834 (1982) (prisoners retain the right to bodily privacy). The extraction of saliva required by the statute implicates this right. However, the statute promotes law enforcement, a compelling state interest, <u>King</u>, 272 Ga. at 791, and it is narrowly tailored to promote law enforcement. The statute requires DNA profiling on incarcerated felons, O.C.G.A. § 24-4-60, a limited population. Further, it forbids the release of felons' DNA profiles except for law enforcement purposes. O.C.G.A. § 24-4-63. Thus, the forcible extraction of saliva does not violate Boulineau and Burney's rights to privacy under the Georgia Constitution.

### III.  CONCLUSION

We conclude the statute does not violate Boulineau and Burney's rights against unreasonable searches and seizures or their rights to bodily privacy under the United States or Georgia Constitutions. As such, we **AFFIRM** the order of the district court.

19