FLAUM, Circuit Judge,
concurring in the judgment.
I concur in the judgment that the Wisconsin GPS monitoring statute, Wis. Stat. § 301.48, does not violate the Fourth Amendment or the Ex Post Facto Clause as applied to Michael Belleau.
The challenge presented by this appeal requires addressing substantial competing interests: an individual’s right to privacy from government monitoring, on the one hand, and the state’s interest in protecting children from sexual abuse, on the other. Both the Fourth Amendment and the Ex Post Facto Clause require balancing these respective interests, the difficulty of which is reflected by the split of appellate courts that have faced constitutional challenges to similar laws. See Doe v. Bredesen, 507 F.3d 998 (6th Cir.2007) (upholding Tennessee’s GPS monitoring law); Riley v. New Jersey State Parole Bd., 219 N.J. 270, 98 A.3d 544 (2014) (striking down New Jersey’s monitoring law); State v. Bowditch, 364 N.C. 335, 700 S.E.2d 1 (2010) (upholding North Carolina’s monitoring law); Commonwealth v. Cory, 454 Mass. 559, 911 N.E.2d 187 (2009) (striking down Massachusetts’s monitoring law).
For the following reasons, I have determined that Wisconsin’s law is constitutional. My analysis is shaped by two overriding considerations. First, sex offenders who target children pose a uniquely disturbing threat to public safety. Their crimes are especially destructive and their rate of recidivism is particularly high. These sexual predators victimize children, who may suffer from trauma from the assault for the rest of their lives. The nature of these offenses, thus, places the state’s interest in combating these particular sex offenses beyond that of general crime control. Because the state’s strong interest in protecting children from sexual predators is paramount, I conclude that the balance should tip in favor of these laws.
Second, I am mindful that the burden imposed by the law at issue is affected by the technology that enables it. As GPS technology becomes more available and affordable, we should approach the govern *939 ment’s use of it with caution, to ensure that it does not upset the balance of rights bestowed by the Constitution. “GPS monitoring — by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to track — may ‘alter the relationship between citizen and government in a way that is inimical to democratic society.’ ” United States v. Jones, — U.S. -, 132 S.Ct. 945, 956, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring) (quoting United States v. Cuevas-Perez, 640 F.3d 272, 285 (7th Cir.2011) (Flaum, J., concurring)).
By the same token, GPS technology has the potential to facilitate effective public policy. Used appropriately, GPS devices can replace more invasive forms of supervision, as well as long prison sentences, benefiting convicted criminals as well as society. And as technology advances, many of the current incidental burdens imposed by devices like this one — such as wearing a bulky ankle bracelet and charging the device for an hour each day — will fall away, leaving only the burden on privacy. Although privacy is a value of constitutional magnitude, it must yield, on occasion, to the state’s substantial interest to protect the public through reasonable regulations in appropriate circumstances. This case presents one of those circumstances.
I.
In Grady v. North Carolina, — U.S. -, 135 S.Ct. 1368, 191 L.Ed.2d 459 (2015) (per curiam), the Supreme Court considered whether North Carolina’s GPS monitoring statute, which is functionally identical to the one at issue in this case, effected a search under the Fourth Amendment.' The Court concluded that GPS monitoring by means of an ankle bracelet constitutes such a search. Id. at 1371. However, Grady left open the question of whether this search was unreasonable, and thus, whether it violated the Fourth Amendment:
The Fourth Amendment prohibits only unreasonable searches. The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations. See, e.g., Samson v. California, 547 U.S. 843 [126 S.Ct. 2193, 165 L.Ed.2d 250] (2006) (suspicionless search of parolee was reasonable); Vernonia School Dist. 47J v. Acton, 515 U.S. 646 [115 S.Ct. 2386, 132 L.Ed.2d 564] (1995) (random drug testing of student athletes was reasonable). The North Carolina courts did not examine whether the State’s monitoring program is reasonable — when properly viewed as a search — and we will not do so in the first instance.
Id. (parallel citations omitted). Hence, Grady directs us to examine whether the search is reasonable by pointing to two threads of Fourth Amendment case law: searches of individuals with diminished expectation of privacy, such as parolees, and “special needs” searches.
I believe that Wisconsin’s GPS monitoring program is a reasonable special needs search. The special needs doctrine applies to suspicionless searches designed to serve needs beyond the normal need of law enforcement. Vemonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). A program does not serve a special need when the primary purpose “is to uncover evidence of ordinary criminal wrongdoing” or “is ultimately indistinguishable from the general interest in crime control.” City of Indianapolis v. Edmond, 531 U.S. 32, 42, 44, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).
*940 In Green v. Berge, 354 F.3d 675 (7th Cir.2004), this Court upheld Wisconsin’s DNA collection law, which permitted the state to collect and store DNA samples from all prisoners convicted of felonies. Id. at 676. After examining the Supreme Court’s jurisprudence on special needs searches, we adopted the view that a program satisfies a special need if the program “is not undertaken for the investigation of a specific crime.” Id. at 678. Because the DNA law’s primary purpose was “not to search for ‘evidence’ of criminal wrongdoing,” but rather “to obtain reliable proof of a felon’s identity,” the program satisfied a special need. Id.
Wisconsin’s GPS program is also designed to serve a special need. The program reduces recidivism by letting offenders know that they are being monitored and creates' a repository of information that may aid in detecting or ruling out involvement in future sex offenses. These goals are not focused on obtaining evidence to investigate a particular crime. Information gathered from this program may, at some later time, be used as evidence in a criminal prosecution, but that is not the primary purpose of the program. Indeed, the program is setup to obviate the likelihood of such prosecutions.
Even if the program does serve a special need, one must still “undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties.” Chandler v. Miller, 520 U.S. 305, 314, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). Turning first to the public interest, in' this case, the state’s interest can hardly be overstated. One of the government’s fundamental responsibilities is to protect the public. That interest is particularly strong when the threat of criminal conduct is so obviously harmful to juvenile victims, who are innocent and defenseless. See McKune v. Lile, 536 U.S. 24, 32-33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (emphasizing the seriousness of the threat posed by sex offenders and noting the government’s “vital interest in rehabilitating convicted sex offenders”).
On the other hand, the privacy interest at issue here is also strong. GPS data allow the government to “reconstruct someone’s specific movements down to the minute,” generating “a wealth of detail about her familial, political, professional, religious, and sexual associations.” Riley v. California, — U.S. -, 134 S.Ct. 2473, 2490, 189 L.Ed.2d 430 (2014) (quoting Jones, 565 U.S. at -, 132 S.Ct. at 955 (Sotomayor, J., concurring)). Further, the GPS monitoring provided under the Wisconsin law occurs constantly, lasts indefinitely, and is the subject of periodic government scrutiny. Accordingly, this monitoring program is uniquely intrusive, likely more intrusive than any special needs program upheld to date by the Supreme Court. See, e.g., Michigan Dept, of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (sobriety checkpoints); Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (drug testing for railway employees involved in train accidents); New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (administrative inspection of a closely regulated business).
Nevertheless, the weight of this privacy interest is somewhat reduced by Belleau’s diminished expectation of privacy. The Supreme Court has established that parolees and probationers have a diminished expectation of privacy. See Samson v. California, 547 U.S. 843, 850, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006); United States v. Knights, 534 U.S. 112, 119-121, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Because of their status, parolees and probationers may be subject to highly intrusive searches, including suspicionless *941 searches of their person and warrantless searches of their homes, at any time. See Samson, 547 U.S. at 852, 126 S.Ct. 2193.
Felons also are expected to forfeit some of their constitutional rights as result of their status. For example, felons cannot legally own a firearm and they may be subject to disenfranchisement. As my colleague Judge Easterbrook has suggested, a felon’s expectation of privacy lies somewhere in-between that of a parolee or probationer and an ordinary citizen. See Green, 354 F.3d at 680 (Easterbrook, J., concurring) (“Established criminality may be the basis of legal obligations that differ from those of the general population.”). This is clearly true of convicted sex offenders, who are commonly subjected to restrictions beyond that of an ordinary felon, such as mandatory registration laws and civil commitment.
As noted above, the special needs balancing inquiry is context specific. See Skinner, 489 U.S. at 619, 109 S.Ct. 1402 (“When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context.”). Therefore, this inquiry must be sensitive to the particular purpose for which the program is designed in assessing whether the traditional safeguards of probable cause and a warrant should apply. Here, the program is designed to prevent and possibly solve sex offenses in the future. In this scenario, there is no specific crime to give rise to probable cause, or even reasonable suspicion. Accordingly, the traditional safeguards of the Fourth Amendment, such as the warrant requirement, are unworkable.
Given the practical constraints to accomplishing the state’s purposes, this program is relatively limited in its scope. Police do not administer the program, or even access the GPS data unless they have some reason to specifically request it. Even the Department of Corrections does not review Belleau’s location in real-time, but only at the end of each day. Additionally, the program is narrowly designed only to track Belleau’s location. It does not infringe on Belleau’s freedom of movement. Other than wearing the GPS device at all times and charging it as needed, Belleau may go where he pleases, when he pleases. In fact, Belleau may even leave Wisconsin, at which point his GPS monitoring will terminate.
Therefore, despite the constitutional magnitude of the privacy interest at stake, the monitoring scheme constitutes a reasonable special needs search. In my view, it does not violate the Fourth Amendment.
II.
The Ex Post Facto Clause provides that “No state shall ... pass any ... ex post facto Law.” U.S. Const, art. I, § 10, cl. 1. The Clause prohibits a state from enacting any law “which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.” Weaver v. Graham, 450 U.S. 24, 28, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (quoting Cummings v. Missouri, 4 Wall. 277, 325-26, 18 L.Ed. 356 (1866)). In short, to demonstrate that the monitoring law violates the Ex Post Facto Clause, Belleau must show that it imposes a retroactive punishment. See United States v. Leach, 639 F.3d 769, 772 (7th Cir.2011).
Unquestionably, this law applies retroactively to Belleau. A law is retroactive if it “changes the legal consequences of acts completed before its effective date.” Weaver, 450 U.S. at 31,101 S.Ct. 960. The monitoring law was enacted in 2006 and went into effect in 2007, however, Belleau committed his crimes in the 1980s, he was *942 convicted in the 1990s, and he completed his sentence in 2005.
Defendants contend that the law does not apply retroactively because it was triggered by Belleau’s release from civil commitment, which occurred in 2010, after the statute went into effect. Not so. The burden imposed by the law is attributable to Belleau’s original convictions. Belleau could only be placed in civil commitment in the first place because of his convictions, which occurred years before the monitoring law was enacted. See Wis. Stat. § 980.01(7) (requiring that a person subject to civil commitment “has been convicted of a sexually violent offense.... ”). Hence, this law applies retroactively.
Next, accepting retroactivity, one must address whether the law imposes a punishment. The Supreme Court has established a two-step framework for making this determination.' First, did the legislature intended to impose a punishment. Smith v. Doe, 538 U.S. 84, 92, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). “If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the State’s] intention to deem it civil.” Id. (internal quotation marks omitted) (alteration in original).
Belleau contends that the legislature’s intent was punitive, not regulatory. An intent analysis examines the statute’s text and structure to determine whether the legislature “indicated either expressly or impliedly a preference for one label or the other.” Id. at 93, 123 S.Ct. 1140 (internal quotation marks omitted). The Wisconsin legislature did not explicitly label this statute as punitive or nonpunitive. Belleau correctly notes that the Wisconsin Department of Correction, which traditionally executes criminal sentences, administers the law. But the Department of Corrections also administers Wisconsin’s sex offender registry, which this Court held was not punitive in Mueller v. Raemisch, 740 F.3d 1128, 1133 (7th Cir.2014). In fact, the monitoring statute at issue in this case is codified in the same chapter as the registration law. See Smith, 538 U.S. at 94,123 S.Ct. 1140 (“Other formal attributes of a legislative enactment, such as the manner of its codification ... are probative of the legislature’s intent.”).
The language of the monitoring statute indicates that the legislature’s objective was to protect children, not punish sex offenders. See, e.g., Wis. Stat. § 301.48(7)(e) (“The court may grant a petition filed ... if it determines ... that the person to whom the petition relates is permanently physically incapacitated so that he or she is not a danger to the public.” (emphasis added)). A legislative restriction “incident of the State’s power to protect the health and safety of its citizens ... evidences] an intent to exercise that regulatory power, and not a purpose to add to the punishment of ex-felons.” Flemming v. Nestor, 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Accordingly, I conclude that the legislature did not intend to impose a punishment.
In any event, Belleau argues that the statute is punitive in effect. “[0]nly the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.” Smith, 538 U.S. at 92, 123 S.Ct. 1140 (internal quotation marks omitted). In Smith, the Supreme Court outlined five of the “Mendozar-Martinez factors,” to determine the punitive effect of a statute. Id. at 97, 123 S.Ct. 1140 (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). These factors examine whether, in effect, the reg *943 ulatory scheme: “has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.” Id. They are neither exhaustive nor dispositive, they merely supply useful guideposts. Id.
Taking these factors one by one, first, GPS tracking does not appear similar to what is generally considered punishment. As an initial matter, GPS technology is relatively new and this technology is essential to the operation of the statute. For that reason, it is distinguishable from traditional forms of punishment. Belleau argues that GPS surveillance resembles forms of state supervision, such as probation, parole, and supervised release. But these forms of supervision are quite unlike Wisconsin’s GPS monitoring program. Historically, government supervision has functioned by imposing restrictions. See id. at 101, 123 S.Ct. 1140 (“Probation and supervised release entail a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction.”). By contrast, Wisconsin’s law imposes essentially no such meaningful restrictions.
Belleau also attempts to liken this law to public shaming, such as branding. As in Smith, “[a]ny initial resemblance to [these] punishments is, however, misleading.” Id. at 98, 123 S.Ct. 1140. The device is only noticeable in public at times, such as when Belleau sits down or walks through a metal detector. But these isolated instances are readily distinguishable from shaming practices. Early forms of shaming were designed to be noticeable, even prominent, while the GPS device is designed to be inconspicuous. The GPS device may “cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.” Id. at 99, 123 S.Ct. 1140.
Second, the law does not impose a significant affirmative disability or restraint. Here, any disability imposed by the law is “minor and indirect” and thus the effect is unlikely to be punitive. Id. at 100, 123 S.Ct. 1140. Belleau is required to wear the GPS device at all times and further, he must charge it by plugging it into an electrical outlet for roughly one hour per day. The restraint imposed by these requirements is minimal and incidental to the law’s actual purpose — tracking Belleau’s whereabouts. Indeed’, as GPS devices become smaller and batteries last longer, any affirmative restraint imposed by this law will, over time, become less and less burdensome.
Third, it is undisputed that the law promotes deterrence, a classic aim of punishment. In fact, deterrence appears to be the primary purpose of the law. However, the fact that it might deter future crimes is not dispositive. Id. at 102, 123 S.Ct. 1140 (“Any number of governmental programs might deter crime without imposing punishment.”). Like the sex offender registration law at issue in Smith, the monitoring statute is not retributive because it imposes as little burden as possible on the offender. See id. Therefore, the law is consistent with a regulatory objective.
Fourth, the law is rationally related to a nonpunitive purpose. This factor is perhaps the “[m]ost significant factor in our determination that the statute’s effects are not punitive.” Id. (internal quotation marks omitted). As discussed above, the law’s primary aim is to protect children, not to punish sex offenders. Id. at 103, 123 S.Ct. 1140 (recognizing public safety as a valid, nonpunitive purpose).
*944 Fifth, the law is not excessive in relation to this nonpunitive purpose. Belleau laments the lack of any individual tailoring in imposing the GPS requirement; he must wear it constantly without any possibility of having it removed. But “[t]he State’s determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the Ex Post Facto Clause.” Id. at 104, 123 S.Ct. 1140.
Further, as Belleau himself acknowledges, pedophilia is a lifelong affliction for which there is no treatment. And such sex offenders have a “frightening and high” rate of recidivism. Id. (internal quotation marks omitted). Coupled with the particularly devastating consequences of their conduct, these offenders pose a unique — and perhaps insurmountable— challenge for conventional law enforcement techniques. Because “[t]he Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences,” this program is not excessive in pursuing a legitimate, nonpunitive purpose. Id. at 103-04,123 S.Ct. 1140.
In sum, an examination of the Mendozcir-Martinez factors leads me to the conclusion that Wisconsin’s GPS monitoring scheme is not punitive in purpose or effect. Therefore, in my judgment, the law in question does not offend the Ex Post Fac-to Clause.