**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 18, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RICHARD M. BANKS; MARY
LAFFICER DOYLE; STANLEY
ALLEN ACUFF; MELANIE POOL
ALPHIN; and LISA RENEE BELL,

    Plaintiffs-Appellants,

v.

UNITED STATES; LEONIDAS
RALPH MECHAM, Director,
Administrative Office of the United
States Courts; ALBERTO R.
GONZALES, Attorney General;
ROBERT S. MUELLER, III, Director,
Federal Bureau of Investigation;
DAVID E. O'MEILIA, United States
Attorney; BRAD STEWART, Chief
Probation Officer, United States
Probation Office,

    Defendants-Appellees.

No. 06-5068

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 05-CV-278-TCK)**

---

Robert Ridenour, Assistant Federal Public Defender (Paul D. Brunton, Federal
Public Defender, and Barry L. Derryberry, Assistant Federal Public Defender,
with him on the brief), Tulsa, Oklahoma, for Plaintiffs-Appellants.

Loretta Finience Radford, Assistant United States Attorney (David E. O'Meilia,
United States Attorney, and Kevin C. Leitch, Assistant United States Attorney, on

the brief), Tulsa, Oklahoma, for Defendants-Appellees.

_____

Before **BRISCOE**, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

_____

**HOLLOWAY**, Circuit Judge.

Government collection of deoxyribonucleic acid ("DNA") samples has caused considerable controversy. From State proposals to expand DNA extraction to misdemeanants, to federal DNA statutes designed to assist police in solving crimes, detractors allude to a police state reminiscent of George Orwell's dystopia portrayed in *1984*. In this case, the challenged federal statute, The DNA Analysis Backlog Elimination Act of 2000,[1] requires convicted felons to submit a DNA sample for inclusion in a national database. The database is used for law enforcement identification purposes; in judicial proceedings if otherwise admissible; for criminal-defense purposes; and for a population-statistic database for identification research, or for quality-control purposes, if personally-identifiable information is removed.

We must decide whether the Fourth Amendment permits compulsory DNA testing of the Plaintiffs, non-violent felony offenders subject to the Act, in the absence of individualized suspicion that they have committed additional crimes.

---

[1] DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C. § 14135 (Dec. 19, 2000), as amended by USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001), as amended by Justice For All Act of 2004, Pub. L. No. 108-405, 118 Stat. 2260 (Oct. 30, 2004) ("the Act").

Applying a totality-of-the-circumstances test, we hold that the Act is constitutional because the Government's interest in extracting DNA from the Plaintiffs outweighs their interests in avoiding the intrusions upon their privacy.

## I.  BACKGROUND

### A.  The DNA Analysis Backlog Elimination Act

DNA is a double-helix shaped nucleic acid held together by hydrogen bonds and composed of base pairings of Adenine and Thymine and Cytosine and Guanine, which repeat along the double-helix at different regions (referred to as short-tandem-repeat loci, or STR loci).  In re Fisher, 421 F.3d 1365, 1367 (Fed. Cir. 2005); United States v. Kincade, 379 F.3d 813, 818-19 (9th Cir. 2004). When analyzed, these STR loci reveal the presence of various alleles, genic variants responsible for producing a particular trait, that represent themselves differently in virtually everyone except identical twins, who share the same DNA. See Kincade, 379 F.3d at 818 n.5, 818-19.

To obtain and profile this information, DNA is extracted from a cell, and the short tandem repeats are copied millions of times.  After separating and marking the short-tandem-repeat sites, an analyst can determine the number of repeats at each of the loci.  See id. at 818-19.  (The FBI generates a 13-loci DNA profile.)  Id.  Since there is only an infinitesimal chance that two people's DNA will be identical in these variable regions, analysts can compare DNA profiles and exclude distinguishable suspects from suspicion.

Given the power of DNA as an identification tool, Congress passed the DNA Analysis Backlog Elimination Act of 2000 requiring those convicted of a "qualifying Federal offense" to provide "a tissue, fluid, or other bodily sample . . . on which . . . [an analysis of that sample's] deoxyribonucleic acid . . ." can be carried out. 42 U.S.C. §§ 14135a(c)(1)-(2) & (a)(1)-(2). The Bureau of Prisons collects the DNA samples from qualified offenders who are in custody, and the federal probation office collects the DNA samples from qualified offenders who are on release, parole, or probation. Id. at §§ 14135a(a)(1)-(2).

In the Act's original form, qualifying federal offenses were primarily limited to violent crimes, such as murder, voluntary manslaughter, and sexual abuse. But in 2004, Congress passed the Justice For All Act of 2004, Pub. L. No. 108-405, 118 Stat. 2260 (Oct. 30, 2004), which expanded the definition of "qualified Federal offense" to include "[a]ny felony." 42 U.S.C. § 14135a(d)(1) (the Act as amended by 118 Stat. 2260). Providing a DNA sample is an explicit condition of qualified offenders' supervised release. 18 U.S.C. § 3583(d). Refusing to submit a DNA sample under the Act is a class A misdemeanor, punishable under Title 18 of the United States Code, 42 U.S.C § 14135a(a)(5), and therefore also a breach of the supervised-release conditions, see 18 U.S.C. §§ 3563(a)(1) & 3583(d) (stating that those on probation or supervised release shall not commit an additional federal, state, or local offense).

After the Attorney General, the Director of the Bureau of Prisons, or the

probation office collects an offender's DNA sample, the collecting party provides each DNA sample to the Director of the Federal Bureau of Investigation (FBI). 42 U.S.C. § 14135a(b). The FBI Director then analyzes the DNA sample and includes the results in the Combined DNA Index System (CODIS), an FBI-created, national database that catalogues DNA profiles from numerous sources, including federal and state convicts, persons who have been charged in an indictment or information with a crime, DNA samples recovered from crime scenes, and from relatives of missing persons. 42 U.S.C. § 14132(a). CODIS "allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system." H.R. Rep. 106-900(I), at 8 (2000).

Once the Director uploads a DNA profile into CODIS, the profile may be disclosed only to criminal-justice agencies for law enforcement identification purposes; in judicial proceedings if otherwise admissible; to a criminal defendant for criminal-defense purposes; and for a population-statistic database for identification research and protocol-development purposes, or for quality-control purposes, if personally-identifiable information is removed. 42 U.S.C. §§ 14132(b)(3)(A)-(D). See 42 U.S.C. § 14135e(b) (stating that DNA profiles may be used only for specified purposes). Those who violate these provisions might have their access to CODIS cancelled, and the Act criminally penalizes those who

disclose a DNA profile without certain authorization. 42 U.S.C. § 14132(c) (cancellation provision); 42 U.S.C. § 14135e(c) (prescribing up to a $250,000 fine and one-year imprisonment for each instance of disclosure).

In addition to these restrictions, the Act is also sensitive to post-conviction proceedings: a felon's DNA information must be expunged from the system if the felon's conviction is reversed or dismissed. 42 U.S.C. § 14132(d).

## B. Procedural History

All of the Plaintiffs were convicted of non-violent felonies. Richard Banks pleaded guilty to one count of bank fraud and was sentenced to 35 months' imprisonment and 5 years' supervised release. Mary Doyle pleaded guilty to one count of theft of government funds and was sentenced to five years' probation. Stanley Acuff pleaded guilty to one count of wire fraud and was sentenced to 16 months' imprisonment and 3 years' supervised release. Acuff committed more crimes while on supervised release—false impersonation and knowingly concealing stolen property—so the district court revoked his term of supervised release and sentenced him to 12 months' imprisonment and 2 years' supervised release. Melanie Alphin pleaded guilty to misprision of a felony, which related to her failure to report another's possession with intent to distribute methamphetamine. Alphin was sentenced to five years' probation. Lisa Bell pleaded guilty to one count of using a false social security number and was sentenced to 14 months' imprisonment and 3 years' supervised release. While on

supervised release, Bell committed more crimes—false statement and false use of a social security number—so, as with Acuff, the court revoked Bell's term of supervised release and sentenced her to 12 months' and 1 day imprisonment and 23 months' supervised release.

The Government requested a DNA sample from each Plaintiff, scheduling May 17, 2005, as the collection day, but they all refused to provide a sample and instead filed this lawsuit requesting declaratory relief and a permanent injunction enjoining the Government from forcing them to comply with the Act.

After converting the Plaintiffs' action into a civil case, the district court, sitting en banc, subjected the Act to scrutiny under the Fourth Amendment's special-needs test and the Fourth Amendment's totality-of-the-circumstances test. See Banks v. Gonzales, 415 F. Supp. 2d 1248 (N.D. Okla. 2006). Based on precedent and the parties' briefs and oral arguments, the court held in an impressive and convincing Opinion and Order that the Act passed constitutional muster under the Fourth Amendment. It therefore granted the Government's motion to dismiss and denied the Plaintiffs' request for a permanent injunction and declaratory relief.

Under the totality-of-the-circumstances test, the district court balanced the degree to which the Act interferes with the Plaintiffs' privacy interests against the degree to which profiling the Plaintiffs' DNA promotes a legitimate governmental interest. After noting that parolees, supervisees, and probationers, such as

Plaintiffs, have a significantly diminished expectation of privacy, the court concluded that extracting DNA from these individuals is a minimal intrusion. On the other side of the balancing scale, the court concluded that the Government has a significant and compelling interest in identifying all felons through DNA profiling, a significant interest in ensuring that parolees comply with their release requirements and are returned to prison or otherwise punished if they fail to do so, and a significant interest in combating recidivism. In light of these significant governmental interests, and the minimal intrusions upon these convicted felons on release, the district court concluded that the Act is constitutional.

In the alternative, the district court upheld the Act under a special-needs test. Following United States v. Kimler, 335 F.3d 1132 (10th Cir. 2003), the district court found that the Act serves a special need beyond law enforcement, the desire to build a DNA database. Once again, the district court then balanced the intrusion upon non-violent felons' privacy against the Government's interest in obtaining DNA from these individuals. Describing and then balancing the same interests identified above, the court concluded that the Government's interests in profiling the DNA outweigh the felons' interests in avoiding the intrusion. The district court therefore held that the Act is constitutional under the special-needs test.

Since the court concluded that the Act is constitutional under both the totality-of-the-circumstances test and the special-needs test, the court granted the

Government's motion to dismiss and denied the Plaintiffs' request for declaratory relief and a permanent injunction. The Plaintiffs now appeal, and we exercise jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

We review de novo the district court's decision granting the Government's motion to dismiss under Fed. R. Civ. P. 12(b)(6). Sutton v. Utah State Sch. for Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999). We accept as true the complaint's well-pleaded factual allegations and will affirm the district court's decision only if the Plaintiffs cannot prove any set of facts supporting their claim for relief. See id.

## A.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The "ultimate touchstone of the Fourth Amendment is 'reasonableness' . . . ." Brigham City v. Stuart, 126 S.Ct. 1943, 1947 (2006).

Government-forced compliance with a blood draw constitutes a search subject to the Fourth Amendment. Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 616 (1989). Likewise, analyzing the DNA contained within the blood sample, or even from a cheek swab, must pass Fourth Amendment scrutiny. Id. See Schlicher v. Peters, 103 F.3d 940, 942-43 (10th Cir. 1996) (stating that

"the collection, analysis and storage of blood and saliva . . . is a search and seizure within the meaning of the Fourth Amendment").

Although much ink has been spilled on the Fourth-Amendment question we must address in this appeal—whether the DNA Analysis Backlog Elimination Act of 2000, as amended, passes constitutional muster under the Fourth Amendment—our sister circuits have taken different analytical routes to analyzing DNA-indexing statutes. While the Second and Seventh Circuits have applied a special-needs analysis, see Green v. Berge, 354 F.3d 675 (7th Cir. 2004); Roe v. Marcotte, 193 F.3d 72 (2d Cir. 1999), the Third, Fourth, Fifth, Eighth, Ninth, Eleventh, and District of Columbia Circuits apply a reasonableness test informed by the totality of the circumstances, see United States v. Kraklio, 451 F.3d 922, 924-25 (8th Cir. 2006); Johnson v. Quander, 440 F.3d 489, 496 (D.C. Cir. 2006); United States v. Sczubelek, 402 F.3d 175, 184 (3d Cir. 2005); Padgett v. Donald, 401 F.3d 1273, 1280 (11th Cir. 2005); United States v. Kincade, 379 F.3d 813 (9th Cir. 2004); Groceman v. U.S. Dep't of Justice, 354 F.3d 411 (5th Cir. 2004); Jones v. Murray, 962 F.2d 302 (4th Cir. 1992). Despite this initial disagreement, each of these circuit courts has arrived at the same conclusion: the federal DNA Act and its State law analogues survive Fourth-Amendment scrutiny.

Like the circuit split on which Fourth-Amendment test to apply, our own precedents are divided. In three successive opinions, this Court applied a totality-

of-the-circumstances test to substantially similar DNA-indexing statutes; in each case, we ultimately concluded that the statutes did not violate the Fourth Amendment.  See Shaffer v. Saffle, 148 F.3d 1180, 1181 (10th Cir. 1998) (citing Boling v. Romer, 101 F.3d 1336 (10th Cir. 1996), with approval and upholding a State DNA-indexing statute under the Fourth Amendment's totality-of-the-circumstances test); Schlicher, 103 F.3d at 943 (same); Boling, 101 F.3d at 1339-40 (applying the totality-of-the-circumstances test and concluding that a State DNA-indexing statute is constitutional).

But in United States v. Kimler, 335 F.3d 1132 (10th Cir. 2003), this Court upheld a federal DNA statute under a special-needs test.  The Kimler Court held that "[t]he DNA Act . . . is a reasonable search and seizure under the special needs exception to the Fourth Amendment's warrant requirement because the desire to build a DNA database goes beyond the ordinary law enforcement need." Id. at 1146.  Notably, Kimler neither explained why building a DNA database is a special need, nor applied a balancing test to determine whether this special need outweighed the defendant's right to privacy.  See id.  Moreover, Kimler cited Shaffer, Schlicher, and Boling—all Tenth Circuit cases that applied the totality-of-the-circumstances test to DNA-indexing statutes—for the proposition that the statute at issue was constitutional under the special-needs test.

There is no apparent rationalization for Kimler's break from our prior case law.  Further, the fact that our prior precedents upheld State DNA-indexing

-11-

statutes, as opposed to the federal statute challenged here, does not materially change our analysis concerning which Fourth-Amendment test to apply. Nor does the fact that the Plaintiffs here are on parole, supervised release, or probation, whereas the offenders in our prior cases were prisoners. See Padgett, 401 F.3d at 1279 (observing that "[i]f the Supreme Court approves dispensing with the special needs analysis for probationers, we are persuaded that we may take a similar approach in cases involving prisoners"). Thus, while we do not eliminate the possibility that the Act satisfies the special-needs test, we follow Shaffer, Schlicher, and Boling, all decided before Kimler, by applying the totality-of-the-circumstances test here.

**B.**

**1.**

As noted, this Court and others have generated multiple opinions addressing federal and State DNA-indexing statutes. These authorities, however, do not expressly control the outcome here. The challenged statutes in our Shaffer, Schlicher, and Boling cases are indistinguishable in all material respects but one: the Act, as amended, requires *all* felons to submit a DNA sample, whereas the statutes in those cases required DNA samples only from felons who committed crimes typically solved by using DNA evidence, such as sexual assaults. We decide whether this distinction matters by applying the Fourth Amendment's totality-of-the-circumstances test.

The Supreme Court has described the totality-of-the-circumstances test as one where "the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests." United States v. Knights, 534 U.S. 112, 119-20 (2001) (internal quotations omitted). In Knights, a State court sentenced the defendant to probation for a drug offense. Id. at 114. As part of the defendant's probation, he agreed to "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." Id. at 114 (alteration and omission in original). Three days after the defendant was placed on probation, the police noticed that the defendant's dispute with a local gas and electric company coincided with vandalism done to that company's power transformer and telecommunications vault. Id. Aware of the defendant's probation order and its search condition, a local detective set up surveillance at the defendant's residence, discovered evidence that the defendant had indeed vandalized the gas and electric company's equipment, and ultimately searched the defendant's residence. Id. at 115. The search revealed evidence all but definitively proving that the defendant vandalized the equipment. Id.

The Supreme Court applied a reasonableness test in Knights, gauged by the totality of the circumstances, to determine whether the government violated the

-13-

Fourth Amendment by searching the defendant's residence. Id. at 118. The Court began by noting that the defendant's status as a probationer subject to a search condition informed both sides of its calculation. Id. at 119. Although the probation condition served a notice function—making the defendant aware that he was subject to a suspicionless search—the defendant's status as a probationer also carried with it intrinsic weight in the government's favor. Specifically, the Court observed that

> [i]nherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled. . . . Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

Id. (internal quotations and citation omitted).

Adding to the defendant's diminished privacy expectations, the Court cited Department of Justice statistics describing probationers' recidivism rate as significantly higher than the general crime rate. Id. at 120 (citing U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, Recidivism of Felons on Probation, 1986-89, pp. 1, 6 (Feb. 1992); U.S. Dept. of Justice Statistics, Probation and Parole Violators in State Prison, 1991, p. 3 (Aug. 1995)). Equally troubling, the Court found that probationers have an even greater incentive than the ordinary criminal to conceal their criminal activities and dispose of incriminating evidence because they are aware that they may be subject

to supervision and the attending consequences of violating their probation conditions. Id. Thus, "[the State's] interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." Id. at 121. With this framework in mind, the Court upheld the search in Knights. Id. at 121-22. See generally Samson v. California, 126 S.Ct. 2193, 2196 (2006) (holding that a suspicionless search of a California parolee, authorized by a California statute, did not violate the Fourth Amendment).

Applying the Knights totality-of-the-circumstances test here, we must balance the degree to which DNA profiling intrudes upon the Plaintiffs' privacy—keeping in mind that these are non-violent felons on parole, supervised release, or probation—against the significance of the governmental interests served by DNA profiling.

We first performed this balancing in Boling, where the plaintiff challenged a Colorado statute requiring inmates to provide the State with a DNA sample before their release on parole if they had been convicted of an offense involving a sexual assault. Boling, 101 F.3d at 1338. Although Boling relied in part on "the specific relevance of DNA evidence to prove sexual assaults," id. at 1340, this court seemed especially persuaded by the similar uses to which both DNA and fingerprints may be put—despite the offender's underlying conviction. For example, Boling quoted at length the Fourth Circuit's exploration of the analogy

-15-

between fingerprinting and DNA profiling:

> [W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. We accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes. This becomes readily apparent when we consider the universal approbation of "booking" procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification. Thus a tax evader is fingerprinted just the same as is a burglar.

Boling, 101 F.3d at 1339 (quoting Jones, 962 F.2d at 306-07) (omissions and alterations in original).

The Boling decision also relied on similar language from the Ninth Circuit's opinion in Rise: "'[T]he information derived from the blood sample is substantially the same as that derived from fingerprinting—an identifying marker unique to the individual from whom that information is derived.'" Id. at 1340 (quoting Rise v. Oregon, 59 F.3d 1556, 1559 (9th Cir. 1995)). Thus, Boling upheld the statute because the inmate had diminished privacy rights, a blood test or cheek swab imposes only a minimal intrusion, and the government has a legitimate interest in solving past and future crimes by using DNA evidence in substantially the same manner as fingerprint evidence. Id.

After Boling, this Court twice had the opportunity to address the constitutionality of a State DNA-indexing statute. See Schlicher, 103 F.3d at 942; Shaffer, 148 F.3d at 1181. In both cases, several State prisoners challenged State

laws requiring them to provide a DNA sample because they had been convicted of certain crimes, such as sex-related crimes, violent crimes, or other crimes in which authorities collect biological evidence. Schlicher, 103 F.3d 941; Shaffer, 148 F.3d at 1181. Neither panel found it necessary to look beyond Boling: "We see no need to reiterate here that which was well said in Boling . . . [so we affirm] the district court's judgment." Schlicher, 103 F.3d at 943. See also Shaffer, 148 F.3d at 1181.

Contrasting Knights and these Tenth Circuit precedents underscores an important distinction: the Plaintiffs here have a qualitatively higher privacy expectation than the inmates in our prior cases addressing DNA-indexing statutes. And as the Seventh Circuit's Judge Easterbrook recognized, courts addressing DNA-indexing statutes must be aware of the privacy continuum that applies to offenders moving through the criminal justice system:

> Prisoners make up the first category. Their privacy interests [implicated by DNA profiling] are extinguished by the judgments placing them in custody. . . .
> Persons on conditional release—parole, probation, supervised release, and the like—are the second category. They have acquired additional liberty but remain subject to substantial controls. . . . DNA collection is less invasive than a search of one's home, and as information from DNA may be very helpful in solving crimes . . . there is no problem under the Fourth Amendment.
> Felons whose terms have expired are the third category. Established criminality may be the basis of legal obligations that differ from those of the general population. . . . Collecting felons' DNA, like collecting their fingerprints, handwriting exemplars, and other information that may help solve future crimes (and thus improve the deterrent force of the criminal sanction) is rationally

-17-

related to the criminal conviction. . . .

Those who have never been convicted of a felony are the last distinct category. What is "reasonable" under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population.

Green, 354 F.3d at 679-81 (Easterbrook, J., concurring).

Although the Plaintiffs are not currently incarcerated, they fall clearly within Judge Easterbrook's second category, convicted felons on release "[who] are not entitled to the full panoply of rights and protections possessed by the general public." Kincade, 379 F.3d at 833; see Green, 354 F.3d at 680. Indeed, the Supreme Court has noted that "[a] broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions . . . of those who have suffered a lawful conviction," McKune v. Lile, 536 U.S. 24, 36 (2002), and that "conditional releasees may claim 'only . . . conditional liberty properly dependent on observance of special parole restrictions' that extend 'substantially beyond the ordinary restrictions imposed by law on an individual citizen.'" Kincade, 379 F.3d at 834 (citing Morrissey v. Brewer, 408 U.S. 471, 478, 480 (1972); Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 365 (1998)). Similarly, the Supreme Court in Knights informed both sides of its reasonableness determination with the defendant's status as a convicted felon serving on probation. Knights, 534 U.S. at 119.

This reduced privacy expectation proved important in United States v. Conley, where the Sixth Circuit upheld the same Act at issue here against a

-18-

challenge by an individual convicted of bank fraud. 453 F.3d 674, 674, 680-81 (6th Cir. 2006). In Conley, the defendant refused to comply with the Act's requirement that she submit a DNA sample as a condition of her supervised release. Id. at 675. She argued, *inter alia*, that the Act violated the Fourth Amendment because the government's interest in collecting DNA from a white-collar criminal like her did not outweigh her privacy interest. Id. at 678. She so concluded because the rate of recidivism is much lower in white-collar criminals than violent criminals, and collecting her DNA would not exonerate her of crime. Id. Applying both a special-needs test and a totality-of-the-circumstances test, the Sixth Circuit rejected the defendant's arguments. The court concluded that the government's interest in properly identifying convicted felons outweighed the defendant's "sharply reduced expectation of privacy, and the minimal intrusion required in taking a blood sample for DNA analysis for identification purposes only . . . ." Id. at 680.

Likewise, the Eleventh Circuit has upheld both State and federal DNA-indexing statutes because the "legitimate interest in creating a permanent identification record of convicted felons for law enforcement purposes outweighs the minor intrusion involved in taking prisoners' saliva samples and storing their DNA profiles, given prisoners' reduced expectation of privacy in their identities . . . ." Padgett, 401 F.3d at 1280; see also United States v. Castillo-Lagos, 147 Fed. Appx. 71, 75 (11th Cir. 2005) (unpublished) (upholding the federal DNA-

-19-

indexing statute against a challenge by a non-violent felon on probation).

## 2.

With these principles in mind, we now determine the reasonableness of the challenged intrusion by balancing the degree to which DNA profiling intrudes upon the Plaintiffs' privacy against the significance of the Government's interest in profiling their DNA.

Courts have recognized several distinct governmental interests supporting the need to profile a convicted felon's DNA. First, the Government may use DNA evidence to identify a qualified federal offender when independent evidence demonstrates that a crime has been committed. See Banks, 415 F. Supp. 2d at 1263-64. It is well settled that once an individual has been convicted, "his [or her] identity bec[omes] a matter of compelling interest to the government . . . and [the individual] can no longer assert a privacy interest in [certain marks of identification]." Sczubelek, 402 F.3d at 184. Given the myriad ways in which criminals attempt to conceal their identities—whether through disguise, changed names, or changed physical features—traditional methods of identifying suspects are not always adequate. Having a previously submitted DNA profile alleviates this problem. As far as scientists have determined, DNA is the most reliable means of identifying individuals. There is an infinitesimal chance that any two individuals will share the same DNA profile unless they are identical twins. Thus, a DNA match between two samples excludes the rest of the population from

suspicion to a near 100% certainty.

Perhaps most important, DNA can also help solve crimes when no other evidence points to a particular suspect. Numerous courts addressing DNA-indexing statutes have explained that "the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes." Boling, 101 F.3d at 1339 (citing Jones, 962 F.2d at 306). See, e.g., Kincade, 379 F.3d at 838. As noted, DNA is a dramatically effective tool for matching suspects to DNA left at a crime scene:

> Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime within samples of blood, skin, semen or hair follicles. The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.

Sczubelek, 402 F.3d at 185-86 (citing Jones, 962 F.2d at 307).

The Government's interest in constructing a DNA database to solve crimes partially aligns with the Plaintiffs' interests: a DNA database would help exonerate innocent defendants and convicts. While a criminal defendant may submit his or her own DNA sample for comparison with the sample discovered at a crime scene, a negative result would not necessarily exculpate the defendant. If other evidence ties the defendant to a crime, even though the defendant is

innocent, the government would be free to argue that two perpetrators committed the crime. The government could easily explain the evidence: the DNA came from the defendant's accomplice and the other evidence points to the defendant's participation. Because the negative DNA test does not eliminate this possibility, and because the other evidence will tie the defendant to the crime, a jury might convict the defendant despite his actual innocence and a negative DNA-test result.

With a comprehensive database like CODIS, however, the DNA discovered from the crime scene might match with a previously unsuspected individual, whom the innocent defendant might be able to show acted alone. The defendant will at least have a better opportunity to create reasonable doubt about whether the government indicted the guilty person. See Akhil Reed Amar, *A Search for Justice in Our Genes*, N.Y. Times, June 7, 2002, at A33 (describing this crime-solving benefit). The Plaintiffs' and the Government's interest in exculpating the innocent appears even more compelling given the frequency of criminal conspiracies involving complex, non-violent crimes, increasing the likelihood that the Government will raise a dual-perpetrator theory despite a negative DNA-test result.

Finally, collecting DNA combats recidivism by solving crimes and removing criminals from the streets and by deterring future criminal acts by felons on release, presumably because the felons know that they are more easily identifiable when the authorities have their DNA. See Rise, 59 F.3d at 1562

(stating that the DNA-indexing statute furthers "the public's incontestable interest in preventing recidivism").  The Supreme Court has repeatedly recognized that rates of re-arrest among parolees and probationers are significantly higher than the general crime rate.  See Knights, 534 U.S. at 120; Griffin v. Wisconsin, 483 U.S. 868, 880 (1987) (stating that probationers are "more likely than the ordinary citizen to violate the law").  This data, in turn, generates the compelling interest in reducing offenders' recidivism rates.  See Ewing v. Califorina, 538 U.S. 11, 26 (2003) (stating that "[r]ecidivism is a serious public safety concern . . . throughout the Nation").  As with solving crimes and identifying suspects, collecting a DNA sample furthers this substantial governmental interest.

While the Government puts forth substantial interests justifying the challenged intrusion, most courts have not given the Plaintiffs' claimed interests more than minimal weight.  For example, blood and saliva tests impose minimal intrusions.  See Skinner, 489 U.S. at 625 (stating that blood tests are commonplace, safe, and "do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity").  Indeed, our Boling decision cited favorably a Ninth Circuit decision, Rise, 59 F.3d at 1560, concluding that "although obtaining DNA information requires drawing blood as opposed to 'inking and rolling a person's fingertips,' that difference does not render the intrusion on Fourth Amendment interests more than minimal."  Boling, 101 F.3d at 1340 (citation omitted).  Moreover, the Plaintiffs "can no longer assert a

-23-

privacy interest in [DNA as a] means of identification" because their convictions made their identities a matter of compelling interest to the government. Sczubelek, 402 F.3d at 184.

The Plaintiffs attempt to overcome the minimal weight on their side of the scale by criticizing the link between the Government's stated interests and the Plaintiffs' status as non-violent felons.

First, the Plaintiffs dispute DNA's utility in solving non-violent crimes. Aplt. Br. at 11-12. For example, the Plaintiffs note that every DNA-based exoneration (cases where the incarcerated individual was exonerated using DNA evidence) between 1989 and 2003 involved crimes of murder and rape. Id. at 13-14 (citing Gross, et al., Exonerations in the United States 1989 Through 2003, 95 J. Crim. L. & Criminology 523, 529 (2005)). Since the Government is unlikely to solve past or future crimes using the Plaintiffs' DNA, they conclude that the Government lacks a significant interest in collecting their DNA to solve crimes. Id. at 12.

To be sure, DNA might prove less valuable in solving non-violent crimes than violent crimes, making the Government's interest in DNA testing more compelling with respect to felons convicted of violent crimes. It is important to realize, however, that DNA can be extracted from hair, saliva, and numerous other parts of our bodies that even a non-violent criminal could leave behind on a piece of inculpatory evidence. See William C. Thompson et al., *Evaluating*

*Forensic DNA Evidence* (pt. 2), The Champion, May 2003, at 25 (citing studies documenting the presence of identifiable quantities of human DNA on doorknobs, coffee cups, and other common items); Amar, <u>supra</u>, at A33 (stating that "[i]f [DNA is] linked to birth certificates and drivers' licenses, the database could foil various kinds of identity fraud, benefiting [sic] both law enforcement and crime victims").

We also note that the exoneration data that the Plaintiffs cite reflect exonerations in a period when the federal DNA-indexing statute did not permit the Government to extract DNA samples from non-violent felons, potentially skewing the data in favor of the Plaintiffs' argument. Nor does the data indicate how frequently the database had been used in attempts to exonerate non-violent felons, who are likely serving shorter prison terms than violent felons and thus less likely to receive preferential access to limited DNA-testing resources until laboratories can eliminate the backlog, which the Act was designed to accomplish. <u>See, e.g.</u>, Bill Dedman, *A Rape Defendant With No Identity But A DNA Profile*, N.Y. Times, Oct. 7, 1999, at A1, A16 (stating that as of 1999, which is during the period studied by the Plaintiffs' authority, approximately 180,000 boxes of evidence, known as rape kits, sat unexamined on shelves in police departments across the nation and that New York was trying to eliminate its own backlog of 12,000); U.S. Department of Justice, Bureau of Justice Statistics, *Survey of DNA Crime Laboratories, 1998* (2000) (stating that as of December

1997, also within the period studied by the Plaintiffs' authority, 69% of publicly operated forensic crime labs across the Nation reported a DNA-analysis backlog totaling 6,800 subject cases and 287,000 convicted offender samples).

Ultimately, following the Plaintiffs' logic to its conclusion would repudiate our recognition in Boling that there is "universal approbation of 'booking' procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification." Boling, 101 F.3d at 1339 (citing Jones, 962 F.2d at 306-07)). Thus, we observed that "a tax evader is fingerprinted just the same as is a burglar." Id. (citing Jones, 962 F.2d at 306-07). Put otherwise, the effectiveness of the Government's plan need not be high where the objective is significant and the privacy intrusion is minimal. See Jones, 962 F.2d at 308 (citing Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990) (validating the state's use of roadblocks to discover drunk drivers despite resulting arrest rate of only 1.5%); Bell v. Wolfish, 441 U.S. 520, 559 (1979) (validating body-cavity search of pretrial detainees despite only one instance in which an inmate was discovered attempting to smuggle contraband")).

Moreover, the Government's interest in solving crimes must be combined with the Government's interest in accurately identifying suspects who might try to conceal their identities in a variety of ways. While fingerprint evidence might often be sufficient, we have always recognized the Government's compelling need

to accurately identify offenders. And on this score, the Plaintiffs' status as non-violent felons does not undermine DNA profiling as an effective way to identify them.

The Plaintiffs also argue that "resting on assumptions that non-violent offenders present a substantial recidivism problem which DNA will address is mere fiction . . . ." Aplt. Br. at 14. The essence of this argument is that while non-violent offenders might have higher recidivism rates than the general population, DNA will not solve this problem because we cannot assume that non-violent offenders will commit crimes typically solved by using DNA evidence. See id. at 13-15.

The Plaintiffs correctly concede that non-violent offenders have higher recidivism rates than the general population. Interestingly, the Supreme Court recently explained that "released property offenders . . . [even] had higher recidivism rates than those released after committing violent, drug, or public-order offenses." Ewing, 538 U.S. at 26. The same report that the Supreme Court relied on also indicated that 69.1% of non-violent felons were re-arrested within three years of release, of which 19.9% were re-arrested for violent offenses, 33.7% were re-arrested for property offenses, 32.6 % were re-arrested for drug offenses, and 28.6% were re-arrested for public-order offenses. U.S. Dept. of Justice, Bureau of Justice Statistics, *Profile of Nonviolent Offenders Exiting State Prisons* (2004), *at* http://www.ojp.usdoj.gov/bjs/pub/pdf/pnoesp.pdf. Likewise,

the Sixth Circuit cited more recent data demonstrating that "the rate of recidivism in white-collar criminals is very close to the rate of recidivism in firearm offenders, and is only slightly lower than felons convicted of robbery." Conley, 453 F.3d at 679 (citing *Measuring Recidivism: The Criminal History Computations of the Federal Sentencing Guidelines*, U.S.S.C., Exh. 11 (May 2004)).

These statistics reveal that not only do non-violent offenders present nearly the same recidivism problem as violent offenders, but they are committing crimes that DNA might help solve (for example, violent offenses, drug offenses, and property offenses). Moreover, although recidivism rates vary with factors like the offender's age and type of conviction, the high likelihood that non-violent offenders will re-offend—and therefore, as the Supreme Court recognized in Knights, be put in the position to conceal their crimes and identities from the authorities—underscores the Government's interest in obtaining the most accurate identification information it can from these individuals. Again, the Plaintiffs' status as non-violent offenders certainly reduces the likelihood that their DNA will help solve past or future crimes. But the Government's interest here is far more real than the "fiction" the Plaintiffs' describe.

Finally, the Plaintiffs' core concern appears to be that DNA can reveal a breathtaking amount of private information, such as probabilistic evidence about the contributor's genetic defects, predispositions to disease, and perhaps even

sexual orientation.  See Aplt. Br. at 11.  The fact that the party extracting a DNA sample profiles only the Plaintiffs' junk DNA (DNA thought not to have a function) might minimize this concern, as these junk DNA samples "were purposely selected because they are not associated with any known physical or medical characteristics."  H.R. Rep. No. 106-900(I) at * 27.  But see Kincade, 379 F.3d at 819 n.6 (citing W. Wayt Gibbs, *The Unseen Genome: Gems Among the Junk*, Sci. Am., Nov. 2003, at 29 (questioning the conclusion that junk DNA does not contain genetic-programming material)).

Regardless, the Act imposes stringent restrictions on the entire collection and profiling process.  For example, the Act eliminates the Government's discretion as to the offenders from whom it may collect a DNA sample.  As noted, the Act clearly defines the offenders who must comply with the Act.  See 42 U.S.C. § 14135a(a)(1)-(2).  The Act also expressly limits the Government's right to use a DNA sample: it may be used only (1) for law enforcement identification purposes; (2) in judicial proceedings if otherwise admissible; (3) for criminal-defense purposes; and (4) for a population-statistic database for identification research, or for quality-control purposes, if personally-identifiable information is removed.  42 U.S.C. § 14135e(b) (stating that the test results may be used only for specified purposes); 42 U.S.C. § 14132(b)(3) (listing the specified purposes).  Those who violate these provisions might have their access to CODIS cancelled, and the Act criminally penalizes those who disclose a DNA profile without

-29-

certain authorization. 42 U.S.C. § 14132(c) (cancellation provision); 42 U.S.C. § 14135e(c) (prescribing up to a $250,000 fine and one year imprisonment for each instance of disclosure). The Act also states that the DNA information must be expunged if the felon's conviction is reversed or dismissed. 42 U.S.C. § 14132(d).

These restrictions allow the Government to use an offender's DNA profile in substantially the same way that the Government uses fingerprint and photographic evidence—to identify offenders, to solve past and future crimes, and to combat recidivism. Only here, DNA provides a more advanced and accurate means to accomplish these worthy governmental ends. In other words, "the DNA profile derived from the defendant's blood sample establishes only a record of the defendant's identity—otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of a qualifying offense." Kincade, 379 F.3d at 837.

To be sure, it is *possible* to put DNA evidence to a more sophisticated and intrusive use. We therefore credit the seriousness of the Plaintiffs' concerns. But the Plaintiffs' "assertion that the state might misuse the information derived from [their] DNA samples, when [they] make[] no allegations of any specific misuse, fails to state a justiciable controversy." Boling, 101 F.3d at 1341. See also Sharon Begley, *Bill Seeking to Ban DNA Discrimination Isn't Really Necessary*, Wall St. J., Feb. 6, 2004, at B1 (stating that a recent study found that "states with

-30-

[DNA anti-discrimination] laws had no fewer cases of genetic discrimination than states without them . . . [because] almost no genetic discrimination is occurring"); Patricia Thomas, *DNA as Data*, Harvard Magazine, Jan.-Feb. 2004, at 48 (describing a genetics professor at Harvard Medical School as saying that genetic discrimination will be pointless in the long run because *every* individual's genome will reveal vulnerability to some health problem). As the Ninth Circuit recognized in Kincade, "our job is limited to resolving the constitutionality of the program before us, as it is designed and as it has been implemented. In our system of government, courts base decisions . . . on concretely particularized facts developed in the cauldron of the adversary process and reduced to an assessable record." Kincade, 379 F.3d at 838 (footnote and citation omitted). There is no evidence that the Government will subject the Plaintiffs to a greater privacy invasion than extracting their DNA sample for the limited statutory purposes, which serve the Government's substantial interest in identifying offenders, solving crimes, and reducing recidivism rates.

We also reject the speculation that allowing the Government to profile convicted felons' DNA opens the door to DNA profiling of every citizen who at some point has a diminished expectation of privacy. This alarmism ignores that "[a] broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions . . . of those who have suffered a lawful conviction," McKune, 536 U.S. at 36.

## C.

Upon our balancing the degree to which DNA profiling intrudes upon the Plaintiffs' privacy against the significance of the Government's interests in profiling their DNA, the balance weighs in the Government's favor.

On one side of the scale, the Government has legitimate interests in accurately identifying offenders, solving past and future crimes, and combating recidivism. We recognize that the Government might not solve as many past and future crimes using DNA profiles of non-violent offenders—a fact that certainly reduces the Government's interest in collecting DNA from these offenders. But the probability that the Government will use non-violent felons' DNA to solve crimes is still notable given that DNA can be extracted from numerous bodily sources that a non-violent felon could leave behind at the scene of a non-violent crime, drug crime, property crime, or violent crime—crimes that non-violent felons commit with much greater frequency than the general population. This fact also underscores the Government's interest in combating non-violent felons' recidivism rates. DNA serves as an identification tool that promotes accuracy in these important endeavors.

Moreover, we would ignore this Court's limited role if we minimized these significant governmental interests after envisioning a non-existent parade of horribles sanctioned by a hypothetical law. See Boling, 101 F.3d at 1341.

On the other side of the scale, felons on conditional release have lesser

privacy interests than do ordinary citizens, and the privacy invasion caused by blood and saliva draws is relatively small. The next chronological step in the process, creating the DNA profile, currently involves a minimal intrusion because the Act severely restricts the uses to which DNA profiles may be put:

> To be sure, genetic fingerprints differ somewhat from their metacarpal brethren, and future technological advances in DNA testing (coupled with possible expansions of the DNA Act's scope) may empower the Government to conduct wide-ranging "DNA dragnets" that raise justifiable citations to George Orwell. Today, however, the DNA Act applies only to felons, and CODIS operates much like an old-fashioned fingerprint database (albeit more efficiently).

Johnson, 440 F.3d at 499 (citations omitted).

Given the Plaintiffs' diminished privacy rights, the minimal intrusion involved in obtaining a DNA sample, and the Act's restrictive provisions, and given the legitimate governmental interests in accurately identifying offenders, solving past and future crimes, and combating recidivism, we hold that collecting and profiling the Plaintiffs' DNA, as authorized and regulated by the DNA Analysis Backlog Elimination Act of 2000, as amended, does not violate the Fourth Amendment. In doing so, we align ourselves with the overwhelming weight of authority on this issue. See Word v. U.S. Probation Dept., 439 F.Supp.2d 497, 506 n.2 (D. S.C. 2006) (stating that at least 24 States have passed laws requiring all felons to provide a DNA sample and that, to the court's knowledge, no federal court or state appellate court had declared the statutes

unconstitutional); <u>Kraklio</u>, 451 F.3d at 924 (collecting cases and stating that every circuit to address a DNA-indexing statute has upheld the statute as constitutional under the Fourth Amendment).

**III.**

The district court did not err by granting the Government's motion to dismiss and denying the Plaintiffs' motion for declaratory and injunctive relief. Its decision is therefore

**AFFIRMED.**