In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 15-3225

MICHAEL J. BELLEAU,

*Plaintiff-Appellee,*

*v.*

EDWARD F. WALL, *et al.,*

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 12-CV-1198-WCG — **William C. Griesbach**, *Chief Judge.*

_____

ARGUED JANUARY 8, 2016 — DECIDED JANUARY 29, 2016

_____

Before BAUER, POSNER, and FLAUM, *Circuit Judges.*

POSNER, *Circuit Judge.* In 1992 the plaintiff, who was then 48 years old, was convicted in a Wisconsin state court of having sexually assaulted a boy repeatedly for five years beginning when the boy was eight years old. (The plaintiff was and is a resident of that state and his crimes occurred there.) Oddly, he was given only a year in jail and probation for these assaults, but before the period of probation expired he was convicted of having in 1988 sexually assaulted a nine-

year-old girl. Sentenced to 10 years in prison for that crime, he was paroled after 6 years. But his parole was revoked a year later after he admitted that he had had sexual fantasies about two girls, one four years old and the other five, and that he had "groomed" them for sexual activities and would have molested them had he had an opportunity to do so.

Scheduled to be released from prison in 2005, instead he was civilly committed to the Sand Ridge Secure Treatment Center in 2004 as a "sexually violent person," Wis. Stat. ch. 980, after a civil trial in which he was found to be "dangerous because he … suffers from a mental disorder that makes it likely that [he] will engage in one or more acts of sexual violence." Wis. Stat. §§ 980.01(7), 980.06; see *id*. §§ 980.01(2), (6). He was released in 2010 on the basis of the opinion of a psychologist that he was no longer more likely than not to commit further sexual assaults. But in 2006 Wisconsin had enacted a law requiring that persons released from civil commitment for sexual offenses wear a GPS monitoring device 24 hours a day for the rest of their lives. Wis. Stat. § 301.48. The statute applied to any sex offender released from civil commitment on or after the first day of 2008 and thus applied (and continues to apply) to the plaintiff. And therefore ever since his release from civil commitment he has been forced to wear an ankle bracelet that contains a GPS monitoring device.

His suit, which is against officials of the Wisconsin Department of Corrections who administer the monitoring statute, claims that the statute violates both the Fourth Amendment to the Constitution and Article I, § 10, cl. 1 of the Constitution, the latter being the prohibition of states' enacting ex post facto laws—laws that either punish people

for conduct made criminal only after they engaged in it or increase the punishment above the maximum authorized for their crime when they committed it. (In the district court he also argued that he'd been denied equal protection of the laws, but he's abandoned that argument on appeal.) The district judge held the Wisconsin monitoring statute unconstitutional on both grounds, precipitating this appeal by the defendants (in effect by the state). Although the judge wrote a long opinion, it omits what seem to us the crucial considerations in favor of the constitutionality of Wisconsin's requiring the plaintiff to wear the ankle bracelet for the rest of his life.

Anyone who drives a car is familiar with GPS technology, which enables the driver to determine his geographical location, usually within a few meters. The GPS ankle bracelet (more commonly referred to as an ankle monitor or anklet monitor; we'll use the latter term), shown below, likewise determines the geographical location of the person wearing it, within an error range of no more than 30 meters. The most common use of such monitors is to keep track of persons on probation or parole; the device that Wisconsin uses is advertised specifically for those purposes. But such devices are also used by some parents to keep track of their kids or elderly relatives and by some hikers and mountain climbers to make sure they know where they are at all times or to track their speed.

The type of anklet worn by the plaintiff is waterproof to a depth of fifteen feet, so one can bathe or shower while wearing it. It must however be plugged into a wall outlet for an hour each day (while being worn) in order to recharge it. There are no restrictions on where the person wearing the

anklet can travel, as long as he has access to an electrical out-
let. Should he move away from Wisconsin, he ceases having
to wear it. And while he's supposed to pay a monthly fee to
compensate for the cost of the anklet, the plaintiff in this case
does not pay it and the Department of Corrections appears
not to have tried to compel him to do so.



When the ankleted person is wearing trousers the anklet
is visible only if he sits down and his trousers hike up sever-
al inches and as a result no longer cover it. The plaintiff
complains that when this happens in the presence of other
people and they spot the anklet, his privacy is invaded, in
violation of the Fourth Amendment, because the viewers as-
sume that he is a criminal and decide to shun him. Of course
the Fourth Amendment does not mention privacy or create
any right of privacy. It requires that searches be reasonable
but does not require a warrant or other formality designed
to balance investigative need against a desire for privacy; the
only reference to warrants is a prohibition of general war-
rants. And although the Supreme Court has read into the
amendment a qualified protection against invasions of pri-
vacy, its recent decision in *Grady v. North Carolina*, 135 S. Ct.
1368, 1371 (2015) (per curiam), indicates that electronic mon-

itoring of sex offenders is permitted if reasonable, cf. *Samson v. California*, 547 U.S. 843, 848–50 (2006); *Vernonia School District 47J v. Acton*, 515 U.S. 646, 652–53 (1995); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 618–24 (1989)—and that standard is satisfied in this case.

Having to wear a GPS anklet monitor is less restrictive, and less invasive of privacy, than being in jail or prison, or for that matter civilly committed, which realistically is a form of imprisonment. The plaintiff argues that because he is not on bail, parole, probation, or supervised release, and so is free of the usual restrictions on the freedom of a person accused or convicted of a crime, there is no lawful basis for requiring him to wear the anklet monitor. But this misses two points. The first is the nature of the crimes he committed—sexual molestation of prepubescent children. In other words the plaintiff is a pedophile, which, as the psychologist who evaluated him explained, "predisposes [the plaintiff] to commit sexually violent acts. … [I]t is well understood in my profession that pedophilia in adults cannot be changed, and I concluded that Mr. Belleau had not shown that he could suppress or manage his deviant desire." The compulsive nature of such criminal activity is recognized in Rules 414 and 415 of the Federal Rules of Evidence, which in contrast to the rules governing cases involving other crimes allow evidence of the defendant's other crimes, or acts, of sexual molestation of children to be introduced in evidence in a criminal or civil case in which the defendant is accused of such molestation.

The plaintiff in our case is about to turn 73, however, and he argues that he has "aged out" of pedophilic acts. There is evidence that the arrest rate of pedophiles declines with age, and from this it can be inferred that pedophilic acts probably decline with age as well, though there are no relia-

ble statistics on the acts, as distinct from the arrests for en-
gaging in the acts. There is no reason to think that the acts
decline to zero. Most men continue to be sexually active into
their 70s, and many remain so in their 80s and even 90s. Sta-
cy Tessler Lindau et al., "A Study of Sexuality and Health
among Older Adults in the United States," 357 *New England
J. Medicine* 762–74 (Aug. 23, 2007). And even if not physically
capable of the common forms of male sexual activity, older
men can still molest and grope young children.

The psychologist who recommended that the plaintiff be
released from civil commitment opined that the risk of the
plaintiff's being charged or convicted of further sex crimes
against young children had been 16 percent when he was
released from civil commitment and could be expected to be
about 8 percent at the time of the district judge's summary
judgment order this past September. It is important to un-
derstand however that such estimates, based on personal
characteristics, such as age, number of past convictions, and
type of victim, pertain only to the odds that the released of-
fender will subsequently be arrested for or convicted of—in
short, detected—committing further sex crimes. Gregory
DeClue & Denis L. Zavodny, "Forensic Use of the Static-99R:
Part 4. Risk Communication," 1 *Journal of Threat Assessment
& Management* 145, 149 (2014). In the words of the psycholo-
gist, "actuarial scales … underestimate the risk an offender
will commit an offense over [his] lifetime."

There is serious underreporting of sex crimes, especially
sex crimes against children. A nationwide study based on
interviews with children and their caretakers found that 70
percent of child sexual assaults reported in the interviews
had not been reported to police. David Finkelhor, Heather

Hammer, & Andrea J. Sedlak, "Sexually Assaulted Children: National Estimates & Characteristics," *Juvenile Justice Bulletin* 8 (August 2008). The true level of underreporting must be even higher, because the study did not account for sexual assaults that go unreported in the interviews. Another study finds that 86 percent of sex crimes against adolescents go unreported to police or any other authority, such as a child protective service. U.S. Dept. of Justice, Office of Justice Programs, "Youth Victimization: Prevalence and Implications" 6 (April 2003); see also Candace Kruttschnitt, William D. Kalsbeek & Carol C. House (eds.), National Research Council, *Estimating the Incidence of Rape and Sexual Assault* 36–38 (2014).

And even if we credit the 8 and 16 percent figures the plaintiff can't be thought just a harmless old guy. Readers of this opinion who are parents of young children should ask themselves whether they should worry that there are people in their community who have "only" a 16 percent or an 8 percent probability of molesting young children—bearing in mind the lifelong psychological scars that such molestation frequently inflicts. See, e.g., Christina Rainville, "Using Undiagnosed Post-Traumatic Stress Disorder to Prove Your Case: A Child's Story," 31 *Child Law Practice* 97 (2012); Beth E. Molnar, Stephen L. Buka & Ronald C. Kessler, "Child Sexual Abuse and Subsequent Psychopathology: Results from the National Comorbidity Survey," 91 *American J. Public Health* 753 (2001). The Supreme Court in *Smith v. Doe*, 538 U.S. 84, 103 (2003), remarked on "the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is 'frightening and high.' *McKune v. Lile*, 536 U.S. 24, 34 (2002); see also *id.* at 33 ('When convicted sex offenders reenter soci-

ety, they are much more likely than any other type of of-
fender to be rearrested for a new rape or sexual assault' (cit-
ing U.S. Dept. of Justice, Bureau of Justice Statistics, *Sex Of-
fenses and Offenders* 27 (1997); U.S. Dept. of Justice, Bureau of
Justice Statistics, *Recidivism of Prisoners Released in 1983*, p. 6
(1997)))."

Of child molesters released from prison in 1994, 39 per-
cent were rearrested (though not necessarily for child moles-
tation) within three years. U.S. Dept. of Justice, Bureau of
Justice Statistics, *Recidivism of Sex Offenders Released from
Prison in 1994*, p. 17, tab. 10 (Nov. 2003). Although non-sex
offenders had a higher rearrest rate (68 percent) than sex of-
fenders and only 3 percent of child molesters were rearrest-
ed for a child-molestation offense, *id.* at 14, 17, these num-
bers don't take account of the very high rate of underreport-
ing of sex offenses. If only 20 percent of child molestations
result in an arrest, the 3 percent recidivism figure implies
that as many as 15 percent of child molesters released from
prison molest again. That's a high rate when one considers
the heavy punishment they face if caught recidivating, and
thus is further evidence of the compulsive nature of their
criminal activity.

In short, the plaintiff cannot be certified as harmless
merely because he no longer is under any of the more famil-
iar kinds of post-imprisonment restriction. As for his civil
commitment having been terminated on the basis of a psy-
chologist's determination that he was not more likely than
not to molest children any longer, we doubt that the com-
munity would or should be reassured by a psychologist's
guess that a pedophile has "only" (say) a 49 percent chance
of reoffending, or even the 16 percent chance estimated in

this case—especially given all the accompanying negatives in the psychologist's report. His affidavit states that the plaintiff is a pedophile and that "pedophilia in adults cannot be changed, and … [the plaintiff] had not shown that he could suppress or manage his deviant arousal," "had not reduced his sexual deviance and had not shown that he could suppress or manage his deviant arousal," "had a mental disorder that predisposed him to commit sexually violent acts," and "was not eligible for supervised release because he had not made significant progress in treatment." There is the further problem that the 16 percent figure is just a guess, and the even more serious problem that the figure implies that of every six pedophiles with characteristics similar to those of the plaintiff in this case one will resume molesting children after his release from prison. Assuming that the anklet would (for reasons we'll explain) deter that person, requiring that it be worn is a nontrivial protection for potential victims of child molestation.

The focus must moreover be on the *incremental* effect of the challenged statute on the plaintiff's privacy, and that effect is slight given the decision by Wisconsin—which he does not challenge—to make sex offenders' criminal records and home addresses public. These records are downloaded by private websites such as Family Watchdog that enable anyone with access to the Internet to determine whether a sex offender—more precisely anyone who has ever been convicted of a sexual offense serious enough to be made public by the state—lives near him. One of the members of this appellate panel, out of curiosity stimulated by another sex offender privacy case, visited Family Watchdog and learned that there were several (one hopes reformed—but it is only a hope) sex offenders living on his street.

So the plaintiff's privacy has already been severely curtailed as a result of his criminal activities, and he makes no challenge to that loss of privacy. The additional loss from the fact that occasionally his trouser leg hitches up and reveals an anklet monitor that may cause someone who spots it to guess that this is a person who has committed a sex crime must be slight.

For it's not as if the Department of Corrections were following the plaintiff around, peeking through his bedroom window, trailing him as he walks to the drug store or the local Starbucks, videotaping his every move, and through such snooping learning (as the amicus curiae brief of the Electronic Frontier Foundation would have it) "whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband," etc. (quoting *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010)). The fruits of such surveillance techniques would be infringements of privacy that the Supreme Court deems serious. See, e.g., *Kyllo v. United States*, 533 U.S. 27, 33–36 (2001); see also *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *United States v. Jones*, 132 S. Ct. 945, 954–56 (2012) (Sotomayor, J., concurring); *id.* at 963–64 (Alito, J., concurring). But nothing of that kind is involved in this case, quite apart from the fact that persons who have demonstrated a compulsion to commit very serious crimes and have been civilly determined to have a more likely than not chance of reoffending must expect to have a diminished right of privacy as a result of the risk of their recidivating—and as Justice Harlan explained in his influential concurrence in the *Katz* case, the only expectation of privacy that the law is required to honor is an "expectation … that society is prepared to recognize as 'reasonable.'" 389 U.S. at 361.

Rather, every night the Department of Corrections makes a map of every anklet wearer's whereabouts that day so that should he be present at a place where a sex crime has been committed, or be hanging around school playgrounds or otherwise showing an abnormal interest in children not his own, the police will be alerted to the need to conduct an investigation. But the main "objective of the searches [the mapping, in this case] was [not] to generate evidence *for law enforcement purposes*," as in *Ferguson v. City of Charleston*, 532 U.S. 67, 83 (2001) (emphasis in original), but instead to deter future offenses by making the plaintiff aware that he is being monitored and is likely therefore to be apprehended should a sex crime be reported at a time, and a location, at which he is present.

The plaintiff's argument that his monitoring violates the Fourth Amendment is further weakened when we consider the concession by his lawyer at oral argument that the Wisconsin legislature could, without violating the Fourth Amendment, make lifetime wearing of the anklet monitor a mandatory condition of supervised release for anyone convicted of sexual molestation of a child. That would be a likely, and seemingly an unassailable, response of the legislature to a decision by this court upholding the district court's invalidation of the GPS-monitoring statute—which is to say that for pedophiles to prevail in cases such as this would give them only a hollow victory.

It's untrue that "the GPS device burdens liberty … by its continuous surveillance of the offender's activities," *Commonwealth v. Cory*, 911 N.E.2d 187, 196–97 (Mass. 2009); it just identifies locations; it doesn't reveal what the wearer of the device is doing at any of the locations. And its "burden"

must in any event be balanced against the gain to society from requiring that the anklet monitor be worn. It is because of the need for such balancing that persons convicted of crimes, especially very serious crimes such as sexual offenses against minors, and especially very serious crimes that have high rates of recidivism such as sex crimes, have a diminished *reasonable* constitutionally protected expectation of privacy.

So let's recapitulate the gain to society from GPS monitoring of convicted sexual molesters. Every night as we said a unit of the Department of Corrections downloads the information collected that day by the anklet monitor and creates a map showing all the locations at which the wearer was present during the day and what time he was present at each location. Should a sexual offense be reported at a location and time at which the map shows the person wearing the anklet to have been present, he becomes a suspect and a proper target of investigation. But by the same token if he was *not* at the scene of the crime when the crime was committed, the anklet gives him an ironclad alibi. Missing this point, the amicus curiae brief of the Electronic Frontier Foundation in support of the plaintiff criticizes anklet monitoring for its accuracy!

A study of similar GPS monitoring of parolees in California found that they were half as likely as traditional parolees to be arrested for or convicted of a new sex offense. Stephen V. Gies, et al., "Monitoring High-Risk Sex Offenders with GPS Technology: An Evaluation of the California Supervision Program," Final Report, pp. 3-11, 3-13 (March 2012). There is no reason to think that GPS monitoring of

convicted child molesters in Wisconsin is any less effica-
cious.

Given how slight is the incremental loss of privacy from
having to wear the anklet monitor, and how valuable to so-
ciety (including sex offenders who have gone straight) the
information collected by the monitor is, we can't agree with
the district judge that the Wisconsin law violates the Fourth
Amendment. The plaintiff argues that monitoring a person's
movements requires a search warrant. That's absurd. The
test is reasonableness, not satisfying a magistrate. Consider a
neighborhood in which illegal drug dealing is common.
There will be an enhanced police presence in the neighbor-
hood and, probably more important, several former or pre-
sent drug dealers whom the police have enlisted as under-
cover agents. The result will be surveillance of the drug sce-
ne. No one (unless it's the plaintiff's lawyer in this case)
thinks that such surveillance requires a warrant.

Or suppose police place hidden cameras in traffic lights
to detect drivers who run red lights. That is investigative
surveillance similar to what the Wisconsin Department of
Corrections is doing with regard to potential sex offenders,
yet no warrant is required for traffic surveillance. It would
be odd to think that the Department of Corrections could not
use GPS monitoring to determine the plaintiff's location at
all times, but could have one of its agents follow him when-
ever he left his house.

It would be particularly odd to think that *all* searches re-
quire a warrant just because most of them invade privacy to
a greater or lesser extent. The terms of supervised release,
probation, and parole often authorize searches by probation
officers without the officers' having to obtain warrants, and

the Supreme Court has held that such warrantless searches do not violate the Fourth Amendment as long as they are reasonable. *Samson v. California*, *supra*; *United States v. Knights*, 534 U.S. 112, 118–120 (2001). The "search" conducted in this case via the anklet monitor is less intrusive than a conventional search. Such monitoring of sex offenders is permissible if it satisfies the reasonableness test applied in parolee and special-needs cases. *Grady v. North Carolina*, *supra*, 135 S. Ct. at 1371. Wisconsin's ankle monitoring of Belleau is reasonable.

We conclude that there was no violation of the Fourth Amendment, and so we turn to whether the GPS-monitoring statute is an ex post facto law, as it took effect after the plaintiff had committed the crimes for which he had been convicted. A statute is an ex post facto law only if it imposes punishment. *Smith v. Doe*, *supra*, 538 U.S. at 92–96. The monitoring law is not punishment; it is prevention. See, e.g., *id.* at 97–106; *Mueller v. Raemisch*, 740 F.3d 1128, 1133–35 (7th Cir. 2014); *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007); cf. *Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1 (2003); *City of Indianapolis v. Edmond*, 531 U.S. 32, 44–46 (2000); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990); *Skinner v. Railway Labor Executives' Ass'n*, *supra*, 489 U.S. at 620–21, 630. The plaintiff does not quarrel with his civil commitment; even though it took away his freedom and was in most respects indistinguishable from confining him in prison, it was not ex post facto punishment because the aim was not to enhance the sentences for his crimes but to prevent him from continuing to molest children. In *Kansas v. Hendricks*, 521 U.S. 346, 368–69 (1997), the Supreme Court held that civil commitment of sex offenders who have completed their prison sentences but are believed to have a psychiatric com-

pulsion to repeat such offenses is not punishment as understood in the Constitution; it is prevention. The aim of the anklet monitor statute is the same, and the difference between having to wear the monitor and being civilly committed is that the former measure is less likely to be perceived as punishment than is being imprisoned in an asylum for the criminally insane. So if civil commitment is not punishment, as the Supreme Court has ruled, then *a fortiori* neither is having to wear an anklet monitor. It is not "excessive with respect to [the nonpunitive] purpose," *Smith v. Doe, supra*, 538 U.S. at 97, for Wisconsin to conclude that all formerly committed sex offenders pose too great a risk to the public to be released without monitoring.

Having to wear the monitor is a bother, an inconvenience, an annoyance, but no more is punishment than being stopped by a police officer on the highway and asked to show your driver's license is punishment, or being placed on a sex offender registry, held by the Supreme Court in *Smith v. Doe, supra*, and by our court in *Mueller v. Raemisch, supra*, 740 F.3d at 1133, not to be punishment. But while citing *Smith v. Doe* the district judge in this case did not properly apply that decision, but instead embraced the hyperbolic statement in *Riley v. New Jersey State Parole Bd.*, 98 A.3d 544, 559 (N.J. 2014), that "the tracking device attached to Riley's ankle identifies Riley as a sex offender no less clearly than if he wore a scarlet letter." No, the aim of requiring a person who has psychiatric compulsion to abuse children sexually to wear a GPS monitor is not to shame him, but to discourage him from yielding to his sexual compulsion, by increasing the likelihood that if he does he'll be arrested because the Department of Corrections will have incontestable evidence

that he was at the place where and at the time when a sexual offense was reported to have occurred.

To return to our traffic analogy briefly: no one thinks that a posted speed limit is a form of punishment. It is a punishment trigger if the police catch you violating the speed limit, but police are not required to obtain a warrant before stopping a speeding car. The anklet monitor law is the same: it tells the plaintiff—if you commit another sex offense, you'll be caught and punished, because we know exactly where you are at every minute of every day. Similar statutes in other states have reduced sex-crime recidivism. And though no one doubts the propriety of parole supervision of sex criminals though it diminishes parolees' privacy, a study by the National Institute of Justice finds that GPS monitoring of sex criminals has a greater effect in reducing recidivism than traditional parole supervision does. Gies et al., *supra*, at vii, 3-11, 3-13.

REVERSED

FLAUM, *Circuit Judge*, concurring in the judgment.

I concur in the judgment that the Wisconsin GPS monitoring statute, Wis. Stat. § 301.48, does not violate the Fourth Amendment or the Ex Post Facto Clause as applied to Michael Belleau.

The challenge presented by this appeal requires addressing substantial competing interests: an individual's right to privacy from government monitoring, on the one hand, and the state's interest in protecting children from sexual abuse, on the other. Both the Fourth Amendment and the Ex Post Facto Clause require balancing these respective interests, the difficulty of which is reflected by the split of appellate courts that have faced constitutional challenges to similar laws. *See Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007) (upholding Tennessee's GPS monitoring law); *Riley v. New Jersey State Parole Bd.*, 98 A.3d 544 (N.J. 2014) (striking down New Jersey's monitoring law); *State v. Bowditch*, 700 S.E.2d 1 (N.C. 2010) (upholding North Carolina's monitoring law); *Commonwealth v. Cory*, 911 N.E.2d 187 (Mass. 2009) (striking down Massachusetts's monitoring law).

For the following reasons, I have determined that Wisconsin's law is constitutional. My analysis is shaped by two overriding considerations. First, sex offenders who target children pose a uniquely disturbing threat to public safety. Their crimes are especially destructive and their rate of recidivism is particularly high. These sexual predators victimize children, who may suffer from trauma from the assault for the rest of their lives. The nature of these offenses, thus, places the state's interest in combating these particular sex offenses beyond that of general crime control. Because the state's strong interest in protecting children from sexual

predators is paramount, I conclude that the balance should tip in favor of these laws.

Second, I am mindful that the burden imposed by the law at issue is affected by the technology that enables it. As GPS technology becomes more available and affordable, we should approach the government's use of it with caution, to ensure that it does not upset the balance of rights bestowed by the Constitution. "GPS monitoring—by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to track—may 'alter the relationship between citizen and government in a way that is inimical to democratic society.'" *United States v. Jones*, 132 S. Ct. 945, 956 (2012) (Sotomayor, J., concurring) (quoting *United States v. Cuevas-Perez*, 640 F.3d 272, 285 (7th Cir. 2011) (Flaum, J., concurring)).

By the same token, GPS technology has the potential to facilitate effective public policy. Used appropriately, GPS devices can replace more invasive forms of supervision, as well as long prison sentences, benefiting convicted criminals as well as society. And as technology advances, many of the current incidental burdens imposed by devices like this one—such as wearing a bulky ankle bracelet and charging the device for an hour each day—will fall away, leaving only the burden on privacy. Although privacy is a value of constitutional magnitude, it must yield, on occasion, to the state's substantial interest to protect the public through reasonable regulations in appropriate circumstances. This case presents one of those circumstances.

**I.**

In *Grady v. North Carolina*, 135 S. Ct. 1368 (2015) (per curiam), the Supreme Court considered whether North Carolina's GPS monitoring statute, which is functionally identical to the one at issue in this case, effected a search under the Fourth Amendment. The Court concluded that GPS monitoring by means of an ankle bracelet constitutes such a search. *Id.* at 1371. However, *Grady* left open the question of whether this search was unreasonable, and thus, whether it violated the Fourth Amendment:

> The Fourth Amendment prohibits only *unreasonable* searches. The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations. *See, e.g.*, *Samson v. California*, 547 U.S. 843 (2006) (suspicionless search of parolee was reasonable); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 (1995) (random drug testing of student athletes was reasonable). The North Carolina courts did not examine whether the State's monitoring program is reasonable—when properly viewed as a search—and we will not do so in the first instance.

*Id.* (parallel citations omitted). Hence, *Grady* directs us to examine whether the search is reasonable by pointing to two threads of Fourth Amendment case law: searches of individuals with diminished expectation of privacy, such as parolees, and "special needs" searches.

I believe that Wisconsin's GPS monitoring program is a reasonable special needs search. The special needs doctrine applies to suspicionless searches designed to serve needs beyond the normal need of law enforcement. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). A program does not serve a special need when the primary purpose "is to uncover evidence of ordinary criminal wrongdoing" or "is ultimately indistinguishable from the general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 42, 44 (2000).

In *Green v. Berge*, 354 F.3d 675 (7th Cir. 2004), this Court upheld Wisconsin's DNA collection law, which permitted the state to collect and store DNA samples from all prisoners convicted of felonies. *Id.* at 676. After examining the Supreme Court's jurisprudence on special needs searches, we adopted the view that a program satisfies a special need if the program "is not undertaken for the investigation of a specific crime." *Id.* at 678. Because the DNA law's primary purpose was "not to search for 'evidence' of criminal wrongdoing," but rather "to obtain reliable proof of a felon's identity," the program satisfied a special need. *Id.*

Wisconsin's GPS program is also designed to serve a special need. The program reduces recidivism by letting offenders know that they are being monitored and creates a repository of information that may aid in detecting or ruling out involvement in future sex offenses. These goals are not focused on obtaining evidence to investigate a particular crime. Information gathered from this program may, at some later time, be used as evidence in a criminal prosecution, but that is not the primary purpose of the program. Indeed, the

program is setup to obviate the likelihood of such prosecutions.

Even if the program does serve a special need, one must still "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler v. Miller*, 520 U.S. 305, 314 (1997). Turning first to the public interest, in this case, the state's interest can hardly be overstated. One of the government's fundamental responsibilities is to protect the public. That interest is particularly strong when the threat of criminal conduct is so obviously harmful to juvenile victims, who are innocent and defenseless. *See McKune v. Lile*, 536 U.S. 24, 32–33 (2002) (emphasizing the seriousness of the threat posed by sex offenders and noting the government's "vital interest in rehabilitating convicted sex offenders").

On the other hand, the privacy interest at issue here is also strong. GPS data allow the government to "reconstruct someone's specific movements down to the minute," generating "a wealth of detail about her familial, political, professional, religious, and sexual associations." *Riley v. California*, 134 S. Ct. 2473, 2490 (2014) (quoting *Jones*, 565 U.S. at 955 (Sotomayor, J., concurring)). Further, the GPS monitoring provided under the Wisconsin law occurs constantly, lasts indefinitely, and is the subject of periodic government scrutiny. Accordingly, this monitoring program is uniquely intrusive, likely more intrusive than any special needs program upheld to date by the Supreme Court. *See, e.g.*, *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990) (sobriety checkpoints); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) (drug testing for railway employees involved

in train accidents); *New York v. Burger*, 482 U.S. 691 (1987) (administrative inspection of a closely regulated business).

Nevertheless, the weight of this privacy interest is some-what reduced by Belleau's diminished expectation of priva-cy. The Supreme Court has established that parolees and probationers have a diminished expectation of privacy. *See Samson v. California*, 547 U.S. 843, 850 (2006); *United States v. Knights*, 534 U.S. 112, 119–121 (2001). Because of their status, parolees and probations may be subject to highly intrusive searches, including suspicionless searches of their person and warrantless searches of their homes, at any time. *See Samson*, 547 U.S. at 852.

Felons also are expected to forfeit some of their constitu-tional rights as result of their status. For example, felons cannot legally own a firearm and they may be subject to dis-enfranchisement. As my colleague Judge Easterbrook has suggested, a felon's expectation of privacy lies somewhere in-between that of a parolee or probationer and an ordinary citizen. *See Green*, 354 F.3d at 680 (Easterbrook, J., concur-ring) ("Established criminality may be the basis of legal obli-gations that differ from those of the general population."). This is clearly true of convicted sex offenders, who are com-monly subjected to restrictions beyond that of an ordinary felon, such as mandatory registration laws and civil com-mitment.

As noted above, the special needs balancing inquiry is context specific. *See Skinner*, 489 U.S. at 619 ("When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the par-ticular context."). Therefore, this inquiry must be sensitive to

the particular purpose for which the program is designed in assessing whether the traditional safeguards of probable cause and a warrant should apply. Here, the program is designed to prevent and possibly solve sex offenses in the future. In this scenario, there is no specific crime to give rise to probable cause, or even reasonable suspicion. Accordingly, the traditional safeguards of the Fourth Amendment, such as the warrant requirement, are unworkable.

Given the practical constraints to accomplishing the state's purposes, this program is relatively limited in its scope. Police do not administer the program, or even access the GPS data unless they have some reason to specifically request it. Even the Department of Corrections does not review Belleau's location in real-time, but only at the end of each day. Additionally, the program is narrowly designed only to track Belleau's location. It does not infringe on Belleau's freedom of movement. Other than wearing the GPS device at all times and charging it as needed, Belleau may go where he pleases, when he pleases. In fact, Belleau may even leave Wisconsin, at which point his GPS monitoring will terminate.

Therefore, despite the constitutional magnitude of the privacy interest at stake, the monitoring scheme constitutes a reasonable special needs search. In my view, it does not violate the Fourth Amendment.

## II.

The Ex Post Facto Clause provides that "No state shall … pass any … ex post facto Law." U.S. Const. art. I, § 10, cl. 1. The Clause prohibits a state from enacting any law "which imposes a punishment for an act which was not punishable

at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 4 Wall. 277, 325–26, (1866)). In short, to demonstrate that the monitoring law violates the Ex Post Facto Clause, Belleau must show that it imposes a retroactive punishment. *See United States v. Leach*, 639 F.3d 769, 772 (7th Cir. 2011).

Unquestionably, this law applies retroactively to Belleau. A law is retroactive if it "changes the legal consequences of acts completed before its effective date." *Weaver*, 450 U.S. at 31. The monitoring law was enacted in 2006 and went into effect in 2007, however, Belleau committed his crimes in the 1980s, he was convicted in the 1990s, and he completed his sentence in 2005.

Defendants contend that the law does not apply retroactively because it was triggered by Belleau's release from civil commitment, which occurred in 2010, after the statute went into effect. Not so. The burden imposed by the law is attributable to Belleau's original convictions. Belleau could only be placed in civil commitment in the first place because of his convictions, which occurred years before the monitoring law was enacted. *See* Wis. Stat. § 980.01(7) (requiring that a person subject to civil commitment "has been convicted of a sexually violent offense …."). Hence, this law applies retroactively.

Next, accepting retroactivity, one must address whether the law imposes a punishment. The Supreme Court has established a two-step framework for making this determination. First, did the legislature intended to impose a punishment. *Smith v. Doe*, 538 U.S. 84, 92 (2003). "If the intention of the legislature was to impose punishment, that ends the in-

quiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Id.* (internal quotation marks omitted) (alteration in original).

Belleau contends that the legislature's intent was punitive, not regulatory. An intent analysis examines the statute's text and structure to determine whether the legislature "indicated either expressly or impliedly a preference for one label or the other." *Id.* at 93 (internal quotation marks omitted). The Wisconsin legislature did not explicitly label this statute as punitive or nonpunitive. Belleau correctly notes that the Wisconsin Department of Correction, which traditionally executes criminal sentences, administers the law. But the Department of Corrections also administers Wisconsin's sex offender registry, which this Court held was not punitive in *Mueller v. Raemisch*, 740 F.3d 1128, 1133 (7th Cir. 2014). In fact, the monitoring statue at issue in this case is codified in the same chapter as the registration law. *See Smith*, 538 U.S. at 94 ("Other formal attributes of a legislative enactment, such as the manner of its codification … are probative of the legislature's intent.").

The language of the monitoring statute indicates that the legislature's objective was to protect children, not punish sex offenders. *See, e.g.*, Wis. Stat. § 301.48(7)(e) ("The court may grant a petition filed … if it determines … that the person to whom the petition relates is permanently physically incapacitated so that *he or she is not a danger to the public*." (emphasis added)). A legislative restriction "incident of the State's power to protect the health and safety of its citizens … evi-

denc[es] an intent to exercise that regulatory power, and not a purpose to add to the punishment of ex-felons." *Flemming v. Nestor*, 363 U.S. 603, 616 (1960). Accordingly, I conclude that the legislature did not intend to impose a punishment.

In any event, Belleau argues that the statute is punitive in effect. "[O]nly the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Smith*, 538 U.S. at 92 (internal quotation marks omitted). In *Smith*, the Supreme Court outlined five of the "*Mendoza-Martinez* factors," to determine the punitive effect of a statute. *Id.* at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)). These factors examine whether, in effect, the regulatory scheme: "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Id.* They are neither exhaustive nor dispositive, they merely supply useful guideposts. *Id.*

Taking these factors one by one, first, GPS tracking does not appear similar to what is generally considered punishment. As an initial matter, GPS technology is relatively new and this technology is essential to the operation of the statute. For that reason, it is distinguishable from traditional forms of punishment. Belleau argues that GPS surveillance resembles forms of state supervision, such as probation, parole, and supervised release. But these forms of supervision are quite unlike Wisconsin's GPS monitoring program. Historically, government supervision has functioned by imposing restrictions. *See id.* at 101 ("Probation and supervised release entail a series of mandatory conditions and allow the

supervising officer to seek the revocation of probation or release in case of infraction."). By contrast, Wisconsin's law imposes essentially no such meaningful restrictions.

Belleau also attempts to liken this law to public shaming, such as branding. As in *Smith*, "[a]ny initial resemblance to [these] punishments is, however, misleading." *Id.* at 98. The device is only noticeable in public at times, such as when Belleau sits down or walks through a metal detector. But these isolated instances are readily distinguishable from shaming practices. Early forms of shaming were designed to be noticeable, even prominent, while the GPS device is designed to be inconspicuous. The GPS device may "cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme." *Id.* at 99.

Second, the law does not impose a significant affirmative disability or restraint. Here, any disability imposed by the law is "minor and indirect" and thus the effect is unlikely to be punitive. *Id.* at 100. Belleau is required to wear the GPS device at all times and further, he must charge it by plugging it into an electrical outlet for roughly one hour per day. The restraint imposed by these requirements is minimal and incidental to the law's actual purpose—tracking Belleau's whereabouts. Indeed, as GPS devices become smaller and batteries last longer, any affirmative restraint imposed by this law will, over time, become less and less burdensome.

Third, it is undisputed that the law promotes deterrence, a classic aim of punishment. In fact, deterrence appears to be

the primary purpose of the law. However, the fact that it might deter future crimes is not dispositive. *Id.* at 102 ("Any number of governmental programs might deter crime without imposing punishment."). Like the sex offender registration law at issue in *Smith*, the monitoring statute is not retributive because it imposes as little burden as possible on the offender. *See id.* Therefore, the law is consistent with a regulatory objective.

Fourth, the law is rationally related to a nonpunitive purpose. This factor is perhaps the "[m]ost significant factor in our determination that the statute's effects are not punitive." *Id.* (internal quotation marks omitted). As discussed above, the law's primary aim is to protect children, not to punish sex offenders. *Id.* at 103 (recognizing public safety as a valid, nonpunitive purpose).

Fifth, the law is not excessive in relation to this nonpunitive purpose. Belleau laments the lack of any individual tailoring in imposing the GPS requirement; he must wear it constantly without any possibility of having it removed. But "[t]he State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause." *Id.* at 104.

Further, as Belleau himself acknowledges, pedophilia is a lifelong affliction for which there is no treatment. And such sex offenders have a "frightening and high" rate of recidivism. *Id.* (internal quotation marks omitted). Coupled with the particularly devastating consequences of their conduct, these offenders pose a unique—and perhaps insurmountable—challenge for conventional law enforcement techniques.

Because "[t]he *Ex Post Facto* Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences," this program is not excessive in pursuing a legitimate, nonpunitive purpose. *Id.* at 103–04.

In sum, an examination of the *Mendoza-Martinez* factors leads me to the conclusion that Wisconsin's GPS monitoring scheme is not punitive in purpose or effect. Therefore, in my judgment, the law in question does not offend the Ex Post Facto Clause.